THE STATE ex inf. CROW, Attorney-General, v. AETNA
INSURANCE COMPANY et al.; and THE STATE ex inf.
CROW, Attorney-General, v. AMERICAN CENTRAL
INSURANCE COMPANY.

In Banc, May 30, 1899.*

1. **Insurance**: RATES FIXED BY AGENTS. Rates for insurance fixed
by an agent of various companies, whose salary they pay, and in
accordance with which they issue their policies and receive all their
premiums, are the rates of the several companies, their conduct
making the acts of the agent their own.

2. ———: ———: COMBINATIONS IN CITIES OF 100,000 INHABITANTS:
CONSTITUTIONAL. That part of the statute which exempts cities of
one hundred thousand inhabitants from the provisions of the act
prohibiting insurance companies or their agents from forming agree-
ments, combinations, pools or trusts for regulating the premium rates
to be paid for insuring property against loss by fire, etc., is not un-
constitutional. It does not divide a natural class, to wit, insurance
companies, into two classes.

3. ———: ———: GENERAL LAWS. A law which relates to fire insur-
ance companies as a class is a general law within the meaning of the
Constitution.

4. ———: ———: GENERAL OR LOCAL LAW. Whether or not a statute
be a local or general law is to be determined by the way it affects
the people as a whole rather than by the extent of the territory over
which it operates. If it affects equally all persons who come within
its range it is not a local or special law.

*Quo Warranto.*

WRITS OF OUSTER DENIED.

*NOTE.—Decided December 13, 1898; motion for rehearing filed, and overruled May
30, 1899.

EDWARD C. CROW, Attorney-General, and SAM B. JEFFRIES, Assistant Attorney-General, for relator.

(1)   The act divides a natural class, to wit, fire insurance companies, into two portions, making two classes out of one, and thus, in effect, arbitrarily enacts different rules for the government of each.   This is contrary to the Constitution and laws of the State of Missouri.   State v. Julow, 129 Mo. 163; State v. Walsh, 136 Mo. 400; Art. IV, sec. 53, Constitution.   (2) This statute is class legislation.   A statute which relates to persons or things as a class is a general law, while a statute which relates to particular persons or things of a class is special legislation.   State ex rel. v. Tolle, 71 Mo. 650; State v. Julow, 129 Mo. 163.   (3)   If a statute attempts to accomplish two or more objects and is void as to one, it may still be in every respect complete and valid as to the other.   Cooley's Const. Lim. (6 Ed.), p. 211; State ex rel. v. Field, 119 Mo. 593; State ex rel. v. Higgins, 125 Mo. 364; State v. Bockstruck, 136 Mo. 335.   It is no objection to sustaining a portion of the law and holding a part invalid that the valid and invalid parts are in the same section.   State v. Bockstruck, 136 Mo. 335.   (4)   Fire insurance combines in cities of one hundred thousand inhabitants or over would have been illegal at common law in Missouri.   R. S. 1889, sec. 6561; 10 Am. Ry. & Corp. Cases, 108; U. S. v. Addyston Pipe & Steel Co., 85 Fed. 287; Greenhood on Public Policy, p. 696; Telegraph Co. v. Crane, 160 Mass. 50; 78 Mo. 584.   (5)   Insurance is a commodity within the meaning of the statute against trusts and combinations.   Beechley v. Mulvihill, 70 N. W. 107; U. S. v. Addyston Pipe & Steel Co., 85 Fed. 271; Metzger v. Cleveland, 13 Ins. L. J. 855; American Fire Ins. Co. v. State, 26 Ins. L. J. 861.

CAMPBELL & RYAN and WADDILL & HEREFORD for respondents.

(1)   The rule established in this State is "that a statute which relates to persons or things as a class, is a general law,

while a statute which relates to particular persons or things of a class, is special." State ex rel. v. Bronson, 115 Mo. 271; State ex rel. v. Bell, 119 Mo. 70; Dunne v. Street Ry., 131 Mo. 1. (2) Law applicable to cities having at the time of the passage of the law, a designated number of inhabitants, or which may thereafter acquire such number, have repeatedly been held by this court to be general not special. Ewing v. Hoblitzelle, 85 Mo. 64; Rutherford v. Heddens, 82 Mo. 388; State v. Herman, 75 Mo. 340; Kelly v. Meeks, 87 Mo. 396; Rutherford v. Hamilton, 97 Mo. 543; State v. Miller, 100 Mo. 439. (3) The proviso in the act is general, not special. The only test as to whether a law is general or special is the possibility of its future application, no matter with what particularity the classification is made. A classification by population is legitimate. State v. Jennings, 98 Mo. 493; State v. Hathaway, 115 Mo. 36; Lynch v. Murphy, 119 Mo. 163; State v. Arnold, 136 Mo. 446; Philips v. Railroad, 86 Mo. 540. (4) It is only when it relates to particular persons or things of a class that it is special. All that can be required is that it shall be general in its application to the class and locality to which it applies. Ewing v. Hoblitzelle, 85 Mo. 64; Lynch v. Murphy, 119 Mo. 163; State v. Burgdoerfer, 107 Mo. 34; State v. Lewis, 101 U. S. 22; Cooley's Const. Lim. 481. (5) The court, with a view to deciding whether a law is a special law or not, will look into the rationale of the matter to determine whether it has a reasonable basis on which to stand. State v. Miller, 100 Mo. 439; State v. Loomis, 115 Mo. 307; State ex rel. v. Bell, 119 Mo. 70; Dunn v. Street Ry. Co., 131 Mo. 5; Railroad v. Ellis, 165 U. S. 155; Cooley's Con. Lim. 480; Beach on Modern Law of Contracts, sec. 1569.

BURGESS, J.—These are *quo warranto* proceedings by the relator, as Attorney-General, against respondents, nonresident insurance companies doing business in this State, to

oust them, upon the ground as alleged in the petition that they are members of a trust and pool at Kansas City, Mo., to regulate and fix the price or premium to be paid for insuring property in said city, against loss or damage by fire, lightning or storm, and to maintain and control the price when so regulated and fixed.

The petition alleges that each of the defendants is a nonresident corporation duly organized and carrying on the business of fire insurance in this State, they having been licensed by the Insurance Commissioner of the State so to do.

The petition then proceeds as follows: "That afterwards, to wit, on the — day of July, A. D. 1897, each and all of said defendant corporations, unlawfully misused and abused their said franchises, rights and privileges as fire insurance companies, authorized to do business under the laws of the State of Missouri, by, within the city of Kansas City, Jackson County, Missouri, creating, entering into, becoming a member of, and a party to a certain pool, trust, agreement, combination, confederation, and understanding with each other, and other fire insurance corporations, and associations of persons, to regulate and fix the prices and premiums to be paid for insuring property in said Kansas City, Jackson County, Missouri, against loss or damage by fire, lightning and storm, and to maintain and control said price when so regulated and fixed.

"That each and everyone of said defendant corporations is represented in said Kansas City, Jackson County, Missouri, by a local resident fire insurance agent, legally and fully authorized by each of said several corporations to act for their respective corporations in all matters relating to the insuring of property against loss or damage by fire, lightning and storm, in said city, and that heretofore, to wit, on the — day of July, A. D. 1897, each of said defendant corporations, by their respective agents (each of which said several agents are duly and legally licensed and authorized to write said insurance under the laws of the State of Missouri), entered into and were

members of, and are now members of, a certain association and organization composed of said fire insurance agents and the agents of other fire insurance companies known as the Board of Underwriters, the exact name of which said Board of Underwriters is to this relator unknown. The general nature and object of said Board of Underwriters is, first, to fix and regulate a certain price or premium to be paid for insuring property against loss or damage by fire, lightning and storm in the said city of Kansas City, and second, to maintain the said prices or premium, when so regulated or fixed, for insuring property against loss or damage by fire, lightning and storm in said city.

"And that the said defendant corporations, through said Board of Underwriters aforesaid, and in pursuance of the object, purpose and intention of said defendant corporations, have unlawfully agreed, combined and confederated with each other, and with other fire insurance corporations (doing business under the insurance laws of the State of Missouri), to form an insurance trust in Kansas City, Missouri, to regulate, fix and maintain the price or premium to be charged by each of said corporations for insuring the different designated classes of risks on property against loss or damage by fire, lightning and storm in Kansas City, Missouri.

"And the said defendant corporations, and other insurance companies, acting with them, in pursuance of the said agreement, combination, confederation and trust, are each of them, through their respective agents, unlawfully maintaining said agreed price or premium upon the respective classes of risks on property against loss by fire, lightning and storm in Kansas City, Missouri, and which said rate so fixed by said agreement aforesaid, is the minimum rate charged in Kansas City, Missouri, by all said defendant corporations. And that said rate aforesaid, so fixed as aforesaid, is the minimum rate agents of said insurance companies are allowed to charge by

said defendant corporations within the city of Kansas City, Missouri.

"And relator charges and avers that since the — day of July, A. D. 1897, said defendant corporations in the city of Kansas City, Jackson County, Missouri, have offended against the laws of this State, and have greatly abused and misused their corporate authority, franchises and privileges, and unlawfully assumed and usurped franchises and privileges not granted to said corporations by the laws of the State of Missouri, by entering into, becoming a member of and a party to said pool, trust, combination and confederation, as aforesaid, to regulate, fix and maintain the price and premiums to be paid for insuring property against loss or damage by fire, lightning and storm in Kansas City, Missouri.

"And relator further charges that the action of the defendant corporations hereinbefore set out, is a gross perversion of the franchise granted to them by the State of Missouri, and an illegal usurpation of privileges not granted to them, and which said usurpation of privileges and franchises not granted them is of great injury to the public."

Respondents answered jointly, admitting that they are foreign corporations duly organized and respectively engaged in the business of fire insurance; and allege that they have complied with the laws of the State of Missouri with respect to foreign insurance companies desiring to do a fire business therein, they having been duly. licensed by the Insurance Commissioner to so do.

The answer then proceeds as follows: "And further answering these defendants deny that on the — day of July, 1897, each and all or any of said defendant corporations unlawfully misused and abused their said franchises, rights and privileges as fire insurance companies authorized to do business under the laws of the State of Missouri; and they deny that they or either of them in the city of Kansas City, Jackson County, Missouri, entered into or became a member of the

party to any pool, trust, agreement, combination, confedera-
tion or understanding with each other and other fire insur-
ance corporations and associations of persons to regulate and
fix the price or premium to be paid for insuring property in
said Kansas City against loss or damage by fire, lightning or
storm, and to maintain and control said price; they admit that
each and every one of said defendant corporations is rep-
resented in said Kansas City by a local resident fire insur-
ance agent, legally and fully authorized by each of said several
corporations to act for their respective corporations in all mat-
ters relating to the insuring of property against loss or damage
by fire, lightning or storm in said city; and defendants deny
that heretofore, to wit, on the — day of July, 1897, that they
or either of them, by their said respective agents entered into
and were members of, and are now members of a certain asso-
ciation and organization composed of said fire insurance agents
and the agents of other fire insurance companies known as the
Board of Underwriters; and they deny that the general nature
and object of said Board of Underwriters is to fix and regulate
a certain price or premium to be paid for insuring property
against loss or damage by fire, lightning or storm in said city
or to maintain the said price or premium when so regulated or
fixed for insuring property against loss or damage by aforesaid
risks in said city; and they deny that they or either of them
through said Board of Underwriters did, on the — day of
July, 1897, or at any date charged in said information, unlaw-
fully agree, combine and confederate with each other or
with other fire insurance corporations doing business under
the insurance laws of the State of Missouri to form an insur-
ance trust in Kansas City, Missouri, to regulate, fix and main-
tain the price or premium to be charged by each of said corpo-
rations for insuring the different designated classes of risks on
property against loss or damages by fire, lightning or storm, in
Kansas City, Missouri; and defendants deny that they, or
either of them, at the time mentioned in said information, in

pursuance of any agreement, combination, confederation and trust, were, through their respective agents, unlawfully maintaining any agreed price or premium upon the respective classes of risks on property against loss by fire, lightning or storm, in said Kansas City; and they deny that they, or either of them, ever fixed by any agreement, the minimum rate to be charged in Kansas City, Missouri, by said defendant corporations or that they have established by any agreement any minimum rate that their agents are allowed to charge for said business within the city of Kansas City, Missouri; and they deny that they, or either of them, ever, by any agreement of any kind whatsoever, with themselves or any other corporation, fixed any rate of insurance upon property in said city of Kansas City, Missouri.

"And further answering defendants say that the truth and facts are as follows: That at and prior to the time alleged in said information, each of these defendants had appointed a local agent in Kansas City, Missouri, each representing his respective company; that said local agent had authority from the respective defendants to make contracts of insurance for and on its behalf, insuring property in said city against loss or damage by fire, lightning or storm, in so far as said respective insurance companies were authorized by their respective charters to effect such different kinds of insurance, and to agree with the assured upon the amount of premium to be charged under the specific contracts effected by them, and that in order to effectuate their business these defendants respectively sent their respective policies of insurance in blank, signed by their respective presidents and secretaries, with their respective corporate seals attached, to their respective agents to be by them respectively countersigned and delivered to the parties with whom they had effected contracts of insurance aforesaid; that during the month of July, 1897, there existed in Kansas City, Missouri, an association known as the Kansas City Board of Fire Underwriters, whose object was the improvement of

the business of fire underwriting, and of the construction of buildings, and whose membership consisted of the agents of the said companies legally authorized to do aforesaid business in Kansas City, Missouri; that the members of said associations under the constitution of said Board of Fire Underwriters were required to submit to the secretary of said association all daily and monthly reports made by them to these respective defendants, all indorsements, renewals, certificates, and all policies spoiled, canceled or not taken, and that the same should not be forwarded to these respective defendants without the stamp of approval thereon of the secretary of said Board of Fire Underwriters; and these defendants allege that said members of said board, fully complied with the aforesaid requirements of said board; they allege that the members of said board were not allowed to write a risk in Kansas City until the rate had been fixed by the secretary of said board; and they allege that said members were required to adhere strictly to the rates so fixed, and that they were not allowed by said rules of said board to cause insurance to be written or placed by any of defendant companies at less than said fixed rate; nor were they allowed to offer, allow, promise or pay any commission, valuable consideration or rebate to any person, firm or corporation not a member of the said board, nor to receive business from any person, firm or corporation engaged in the insurance business not a member of said board, without a permit from the secretary of said board; and they allege that said members were required to submit their books and papers for inspection to said board and to undergo personal examination, under oath, when required by said board, and that fines and penalties and expulsions were provided as punishments for any infraction of the rules of said board; and these defendants allege that the only transactions of said Board of Fire Underwriters were the classification of the various subjects of insurance, and the fixing of rates of premiums to be charged and maintained by the members of said board, and these defendants say that they had

respectively information concerning the transactions of aforesaid Board of Fire Underwriters, and information that their respective local agents were members of said board; that said Board of Underwriters classified the subjects of insurance at Kansas City, and fixed and maintained the rates of insurance thereof, but they respectively deny that they or either of them were ever members of said board, or in any manner subjects to its rules and regulations, except as hereinbefore stated.

"And further answering these defendants say that the constitution, rules and transactions of said Board of Under-writers did not in any manner constitute it a pool, or a trust or a conspiracy to control prices; nor did they constitute an agreement, combination, confederation or understanding with any other corporation, partnership, individual or any other person or association of persons to regulate, fix or maintain the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm.

"And these defendants further answering say that said Board of Fire Underwriters was not at the date mentioned in said information engaged in any business reprobated or forbidden by the laws of this State, and they deny that since the date mentioned in said information, to wit, July —, 1897, they, or either of them, in the city of Kansas City aforesaid, have offended against the laws of this State, or have abused and misused their respective corporate authority, franchises and privileges, or that they have unlawfully assumed or usurped franchises and privileges not granted to defendants by the laws of the State of Missouri; and they respectively deny that they have entered into or become a member of or party to any pool, trust, combination and confederation as aforesaid, to regulate, fix and maintain the prices and premiums to be paid for insuring property against loss or damage by fire, lightning and storm in Kansas City, Missouri; and they deny that they or either of them have been guilty of a perversion of the franchises granted to them by the State of

Missouri, or of any usurpation of privileges not granted to them, or that they or either of them have in any manner injured the public as set forth in said information, all of which said respective defendants are ready to prove and verify as the court shall award."

W. J. Fetter testified in behalf of relator substantially as follows: "In July, 1897, the respondents were engaged in the fire insurance business in Kansas City, Missouri, and their agents were then members of the Kansas City Board of Underwriters, and that said board was composed of the agents of fire and tornado insurance companies. The board is an unincorporated institution, but have a constitution and rules by which they are governed, which were adopted February 25, 1897, and have not since been altered or amended. The rates of insurance in Kansas City, Missouri, are fixed by myself, and not by the Board of Underwriters. This was by agreement among the insurance agents in the city. The estimates on dwellings are in card form. When agents want estimates on dwellings they ask for the card, which has only estimates on dwellings, private barns and churches. When an agent wants rates on business houses in the city he calls on me for them. About seventy-five per cent of the business written in the city during the dates named in the petition was written at the rates fixed by me. My duties as secretary of the board are prescribed by the rules of the board. The board was organized many years ago. My salary as secretary of the board is received from the insurance companies. The board has two funds, or rather there are two funds in connection with it. The board have a fund of their own, they charge a membership fee of $200 for every member, and accumulate a fund in that way. I am paid by the companies for making rates and attending to the office business of the companies. The companies do not pay the expenses of the board that the agents make; they have to pay that themselves. I act in a double capacity. I have the companies' money and pay it out

according to their order.   The companies contribute to these expenses and my salary on the basis of the business that they do and this amount is determined by the business that goes through my office.   All the business of the members of the Board of Underwriters at Kansas City is supposed to go through my office.   The daily reports of the insurance agents are sent to my office.   These are reports on the policies written and they contain a statement of the specific insurance, which is called in insurance circles, the daily reports.   These daily reports contain statements of the location of the property, its occupancy, and the character of the building, whether a store, factory, etc., and also contain the rates at which the risk is written.   It is sent to my office for the purpose of having the rate stamped on it.   If the rate in the policy or report that comes to my office is not the rate according to my estimate, I return it to the agent and ask him to correct it.   If he does not correct it, then I send it to the company and ask them to correct it.   I first try to get the agent to correct it; generally he does.   I suppose there is $800,000 worth of premiums collected annually in Kansas City outside the board and inside the board.   The total premiums in the State of Missouri amount to $4,600,000 per annum.   Premiums in St. Louis last year were $2,100,000, and deducting the $2,100,000 and the $800,000 in Kansas City from the $4,600,000, it would leave less than $2,000,000 for the rest of the State outside of St. Louis and Kansas City."   Witness stated that the rate as fixed by him was the rate at which the companies intended the business in Kansas City to be written by their agents.   And the rate fixed by him is the rate generally maintained by the agents of the companies as members of the Board of Underwriters of Kansas City, Missouri.   "The object of the agreement is to maintain and obtain the rate that I make; the agreement among the agents is for the purpose of maintaining the rates of insurance and that is the object of fixing the rates by myself.   Each agency has one membership in the Board of

Underwriters.    The companies have knowledge of the existence of this Board of Underwriters.    And in a general way they know that I make the rates for the board and that the board maintains the rates I supply them.    That is one of the general objects of the board.    This agreement as to rates applies both to fire and tornado insurance."

On cross-examination he testified substantially as follows: "I have been in the fire insurance business 48 or 49 years. For 16 years I have been engaged in preparing rates and furnishing information to insurance companies.    My business during that time has been to gather up information and make rates. Previous to 1893 for a number of years premiums had been gradually decreasing in Missouri and losses gradually increasing until the companies found that they were losing money rapidly and then it became necessary to increase rates.    There was at that time a State Board of Underwriters that had control of that branch of the business and they increased the rates in this State in 1893 and 1894 considerably."    Witness was permitted to testify, over the objection of counsel for relator, that the rates fixed by witness in Kansas City were reasonable. "The rates are prepared on data that take into consideration the merits of the building for resisting fire; whether or not they have a shingle roof, or tin roof, and whether or not a skylight is in the building, and the size of the same.    Also an elevator shaft is considered if there is one; also any other exposures. These additions to rates or reductions from rates are based upon a general experience in the insurance business, and are arrived at by the losses.    The facilities for extinguishing fire, and whether or not a town has a good fire department, are all taken into consideration in fixing the rate.    Insurance statistics have been kept, but have not been collated.    I fix my rates in this way: for instance, I take any large district, as, for instance, the State of Missouri, and the different companies say we are losing money on a certain class of risks, say a planing mill, and one company says we are losing money on this class of risks,

and another company says we are losing money on same class, and still another company says the same thing, and so on until it seems a majority of the companies are making a complaint, and the general idea is that there is a loss in that particular class of business, and in that way we add to the rate. There is also a general experience, and well recognized feature in risks called the 'mortality' of a risk. To illustrate what I mean, I would say that some risks have a moral hazard that you can not apply to the individual. For instance, several years ago there were a great many woolen factories started in this State. These factories were burned one after another until the complaint against them became general among the companies. There was a moral hazard in that. You could not point exactly to some one man and say he burned his factory, but altogether it was a loss and it was agreed generally that the business was not profitable, and accordingly the rate was raised. After this came the starch factories, and after a while the creameries were started in the little towns in Missouri, and they burned with surprising regularity. You could not prove that they had been willfully destroyed, and yet the business was unprofitable. There was another moral hazard. You can not point out a specific case of arson in these instances, but the hazard is there. And these divers and scattered causes all converge to make the rate. The first advantage to the companies in having myself fix the rates is to give the companies an adequate rate, that is, one sufficient to pay the losses and expenses and reasonable profit on the capital invested. Two or three years ago we had some heavy losses in Kansas City in the West Bottoms in high buildings where water pressure was not sufficient. These fires proved what insurance people had claimed for several years, to wit, that the water pressure in that vicinity was not sufficient. The result of these fires was that we increased the rate of insurance in the West Bottoms 25 per cent. The Board of Underwriters at Kansas City has an inspector out looking after hazardous things about build-

ings, such as rubbish, imperfect shutters and doors and gaso-
line and things of that kind.   The object of all this, of course,
is to decrease the fire risk.   There is also a city inspector of
buildings who is employed by the city government of Kansas
City and he examines the buildings in the course of erection.
When Kansas City makes reductions that we deem necessary
there will be a reduction in the rates in the eastern part of the
city.   There is a Salvage Corps or Underwriters' Patrol main-
tained by the city, to which the insurance agents and com-
panies contribute each $100 per annum and which is for the
protection of property at fires by covering goods with tarpau-
lins."   Witness testified that this Board of Fire Underwriters,
however, while the effect of such board in other parts of the
country might be to reduce rates, had not reduced rates in
Kansas City, Missouri, because, as witness said, of a lack
of proper facilities along the southwest boulevard caused
by insufficient supply pipe.   "I have no special rate book
for Kansas City, but I have in my office a copy of the
rates for Kansas City and the companies pay me for my
work in fixing and getting up these rates.   There is nobody
interested in my work in getting up rates in insurance except
the insurance companies whose agents are members of the
Board of Underwriters.   I have really a dual capacity.   I am
secretary of the Board of Underwriters, organized by the
agents, and then I have other work, the making of rates, ex-
amining daily reports, but the examination of the daily reports
is another branch of the business.   This business is all business
of the companies."

On redirect examination, he said:   "The basis of my
rates in Kansas City is not in my own information alone, but
is a rather general concensus of opinion and experience
of the companies and agents, not written opinions, but col-
lected by means of a general knowledge and information.   This
data I do not find anywhere collated.   In making a rate I am
governed very frequently by the general ideas of all the com-

panies, as I get it.   The rates were increased two or three years ago, but were reduced in the West Bottoms where water-works improvements were made, but the rates have not been reduced to what they were before in the eastern or residence portion of the city.   Nor in a portion of the business part of the city.   I do not absolutely fix them.   Some years ago we adopted what is called the "St. Louis Schedule" with a reduction of 5 per cent from said schedule on the buildings, and a reduction of 10 per cent on the business stocks.   This schedule applies only to business property; it does not apply to dwellings.   Since that time I have made increases or reductions in the various risks in Kansas City straight along as it seemed to me to be proper or necessary.   And I determined the rate in July, 1897, and through 1897, at which business would be written.   My efforts were to make a rate that would enable companies to pay expenses and make a profit on the capital invested and I was moderately successful in the year of 1897 in doing this.   The companies made some money in Kansas City in 1897.   If it was not for this Board of Underwriters the rates of insurance would not be uniform in Kansas City. Non-uniformity in rates would result from a competition for business.

"The Salvage Corps that I have mentioned is a part of the city government of Kansas City, Missouri.   The Chief of the Fire Department of Kansas City nominates the members of the Salvage Corps and they are confirmed by the city council.   In the work the Salvage Corps does in a fire they are under the control of the Chief of the Fire Department.

"No one other than myself has a right to change a rate in Kansas City.   As a rule when I raise or lower rates, my action is not subject to review.   Sometimes, of course, the agents think the rates fixed by me are unreasonable and they appeal to the companies and then the companies and myself adjust the matter.   I am really the agent of the companies. The companies would simply, if they thought a rate was.

wrong, express an opinion about it, but would enter no protest. And to require me to change a rate it would take a concensus of opinion of all the companies interested. The object of the Board of Underwriters at Kansas City is the uniformity of rates. The companies that were represented in the Board of Underwriters and that contribute to my salary as secretary, expect their business to be written at the rate I fix. The Board of Underwriters was organized exclusively for the purpose of dealing with the insurance business. The insurance business is confined exclusively to fire and tornado insurance. The companies, I suppose, expect the business to be written at the rate I fix. It was understood by the companies that they were to obtain these rates that were made by me and which they paid me for making. These companies are engaged in a general way in writing the same class of risks. I place a stamp on the policies of the representatives or agents of the companies and then forward the policies to the companies. The policies go direct from my office to the companies. I was not entitled to any compensation from the Board of Underwriters. I keep the official records of the board, though. I presume I was the medium between the companies and the board by which the business was carried forward."

James A. Waterworth testified as follows: "Been president of the Board of Fire Underwriters of St. Louis for fifteen years. The Board of Fire Underwriters has been engaged in obtaining the adoption of what is called slow-burning methods of construction here in the city of St. Louis. That pertains to buildings of large size and then another method was adopted, that of obtaining the erection of fire-proof buildings, such as are built of indestructible material, with the elevators and staircases inclosed by brick, so that no communication of fire or heat will proceed from one floor to the other. These are the chief modern improvements of construction. Accompanying

these are other improvements.    One was an external opening for air made fire-proof, so there would be protection from the outside.    Standard slow-burning buildings get a reduction in St. Louis of 40 per cent from the regular rate.    This is 40 per cent from the regular rate made for the smaller buildings constructed as ordinary buildings are with lath and plaster. A fire-proof building gets a reduction of 50 per cent from this rate and in some instances where it is a fire-proof building, used exclusively for offices, it gets as much as 60 per cent reduction. Each local point has the liberty to make its own estimate of what the construction is worth.    These fire-proof buildings act as a fire-wall to prevent the spread of fire.    Then after the construction of buildings there is another class of improvements, for instance, the automatic sprinkler, which is an arrangement by which at every 10 feet square in some places and 8 feet square in others, according to requirement, there is put on the water pipes what is called a sprinkler head, which opens by the heat.    The solder, which keeps it together, being usually fusible, melts at a temperature of 160 degrees.  Whenever the heat of a room goes to 160 degrees under one of these sprinkler heads, the sprinkler head opens and discharges water over 100 square feet immediately below it, and is looked on by insurance men as an effective means of stopping fire in its incipiency, and therefore we make an allowance where it is constructed properly, according to the character of the building and the goods, from 35 per cent up to 60 per cent. Wherever insurance companies have caused an expression of their views on these questions, if it is a place where there is a local organization, then the Board of Underwriters makes its estimate and if there is no local organization the individual company makes its own estimates of what deductions should be made for this class of improvements.    Then there is the automatic alarm which is a contrivance by which when the temperature over any point rises above the normal, say to 130 degrees, an electric current communicates with a gong and the

fire alarm is rung. These automatic appliances are attached to the ceiling at the same interval as I have stated for automatic sprinklers. For these automatic alarms a reduction is also made in the rate. Then there are automatic clocks for the night watchman. In some of these buildings there are signal stations at a certain distance on each floor of the building, where the watchman as he approaches touches a button which records his presence at the central station down town. For them we make an allowance in rates. All these things have tended to reduce the fire risk. The Chicago fire cost about $200,000,000; the Boston fire about $70,000,000." Witness then proceeded to give a detailed statement of his efforts as a member of the Board of Fire Underwriters of St. Louis, to improve the fire pressure in the city of St. Louis. The testimony of the witness, however, tended to show that although in 1893 these improvements were not all used, in fact hardly any of them, yet premiums were several hundred thousand dollars greater in St. Louis than they were in 1897, although the valuation of the city of St. Louis had gone up $60,000,000 and the actual insured values had gone up $100,000,000."

On cross-examination the witness stated that the premiums paid by insurance companies in St. Louis were larger than they were in 1896 and 1897, although the volume of business in 1897 was larger than it was in 1892, and the assessable wealth of St. Louis was greater than it was in 1892. That the companies did not make as much money in 1897 as they did in 1892, although these improvements had been made. "The general improvements, automatic sprinklers, electrical appliances, and improvements in the water service of cities certainly benefit insurance. This class of improvements I have been speaking of applies only to what is known as mercantile risks and does not apply to dwelling house risks. Taking the whole State of Missouri, the insurance rates have been remarkably steady for the last ten years."

Section 19, of the rules of order adopted by the Board of Underwriters of Kansas City, Missouri, reads as follows: "Members shall submit to the secretary all daily and monthly reports, indorsements, renewals, certificates and all policies spoiled, canceled or not taken, and shall not forward the same to the companies without the secretary's stamp of approval thereon. They shall not write a risk until the rate has been fixed by the secretary, and shall adhere strictly to the rate so fixed; nor shall they issue a policy or policies, or cause insurance to be written or placed by any company at less than said fixed rates."

Section one of an act of the General Assembly of the State of Missouri against pools, trusts and conspiracies, approved March 24, 1897, page 208, Acts of 1897, reads as follows:

"Section 1. Any corporation organized under the laws of this or any other State or country for transacting or conducting any kind of business in this State, or which does transact or conduct any kind of business in this State, or any partnership or individual, or other association of persons whatsoever, who shall create, enter into, become a member of or a party to any pool, trust, agreement, combination, confederation or understanding with any other corporation, partnership, individual, or any other person or association of persons, to regulate or fix the price of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, any product of mining, or any article or thing whatsoever, or the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm, or to maintain said price when so regulated or fixed, or shall enter into, become a member of or a party to any pool, agreement, contract, combination or confederation to fix or limit the amount or quantity of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, any product of mining, or any article or thing whatsoever, or the price or premium to

be paid for insuring property against loss or damage by fire, lightning or storm, shall be deemed and adjudged guilty of a conspiracy to defraud, and be subject to penalties as provided in this act; Provided, however, that the provisions of this section shall not apply to agreements of fire insurance companies, or their agents, or boards of fire underwriters, to regulate the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm in cities in this State which now have or which may hereafter acquire a population of one hundred thousand inhabitants or more; and provided further, that if such insurance companies, or their agents, or the board of fire underwriters doing business in any such city, shall combine in such city, either directly or indirectly, or agree or attempt to agree, directly or indirectly, to fix or regulate the price or premium to be paid for insuring property located wholly outside of such city against loss or damage by fire, lightning or storm, such company so violating the provisions of this act, either by itself, its agents, or by any such board of underwriters, shall be taken and deemed to have forfeited its right to do business in this State, and shall become liable to all the penalties and forfeitures provided for by the provisions of this act."

It is manifest from the evidence in this case that respondents were at the time of and before the institution of these proceedings unless, exempted therefrom by the proviso in said section, acting in violation of that provision of the section of the act quoted, which prohibits any corporation doing business in this State from entering into any agreement, combination or understanding with any other corporation to regulate or fix the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm, or to maintain said price when so regulated or fixed (State v. Phipps, 50 Kan. 609), and it makes no difference that an agreement to that effect was entered into by the agents of respondents instead of themselves, for it is perfectly clear that the rates

on insurance were fixed by their agent whose salary they paid, and that they received premiums upon all policies issued by their agents in accordance with the rate fixed by him, thereby making the acts of their agents their own.

The secretary of the Board of Underwriters of which he, and other agents of respondents were members was empowered to fix the rates, and no member of the board could write a risk until the rate was fixed by him as secretary, nor could they issue a policy, or cause insurance to be written or placed by any company at less than the rates thus fixed.

The question then is, are the respondents with respect to fire insurance in Kansas City, Missouri, exempted from the penalties imposed by said act, by the proviso in said section by which it is provided that its provisions shall not apply to agreements of fire insurance companies' or their agents, or boards of fire underwriters, to regulate the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm, in cities in this State which now have or which may hereafter acquire a population of one hundred thousand inhabitants or more?

The Attorney-General insists that this proviso is unconstitutional upon the ground that it divides a natural class, to-wit, fire insurance companies, into two portions, making two classes out of one, and thus, in effect, arbitrarily enacts different rules for the government of each. We are unable to see the force of this contention. The act as we understand it does not divide insurance companies into two classes, but by the proviso such companies are simply exempted from the provisions of the act prohibiting them, their agents, and boards of fire underwriters, from regulating the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm, in cities in this State which now have or which may hereafter acquire a population of one hundred thousand inhabitants or more. This is but saying by implication, at least, that insurance companies may by agreement

fix the rate of insurance to be charged by them for fire insur-
ance in such cities.

Section 53, Art. IV, of the Constitution of this State pro-
vides that, "The General Assembly shall not pass any local
or special law . . . . . . . granting to any corporation, association
or individual any special or exclusive right, privilege or im-
munity," and it is argued by relator that the proviso in the act
in question is in conflict with that provision of the Constitution
because it imposes upon a combination of certain wholesale
dealers in St. Louis and Kansas City special obligations or
burdens from which insurance companies in said cities are
exempt.

The cardinal rule in this State is "that a statute which
relates to persons or things as a class, is a general law, while
a statute which relates to particular persons or things of a
class, is special." [State ex rel. v. Herrmann, 75 Mo. loc.
cit. 354; Lynch v. Murphy, 119 Mo. 163.]

In State ex rel. v. Bronson, 115 Mo. 271, a section of an
act of the General Assembly was under consideration which
provided that "from and after the first day of September,
1891, no text-book upon the subject named in section 5, of
this Act, except those contracted for by said commission,
shall be sold for use in the public schools of Missouri; and,
from and after the first day of September, 1892, no text-
book upon the aforesaid subjects, except those contracted for
by said commission, shall be used or taught in any public
school within this State; Provided, that this act shall not apply
to any city or district which now contains or may hereafter
contain more than one hundred thousand inhabitants," and
it was held that the proviso did not make the law unconstitu-
tional.

The proviso relates to fire insurance in cities of a class,
that is, cities in this State which now have or which may here-
after acquire a population of one hundred thousand inhabitants
or more, and while there are but two of such cities in this

State at this time, St. Louis and Kansas City, it has been repeatedly held by this court that such a law is general and not special. [Ewing v. Hoblitzelle, 85 Mo. 64; Rutherford v. Heddens, 82 Mo. 388; State ex rel. v. Herrmann, 75 Mo. 340; Kelly v. Meeks, 87 Mo. 396; Rutherford v. Hamilton, 97 Mo. 543; Lynch v. Murphy, 119 Mo. 163.]

In State ex rel. v. Miller, 100 Mo. 439, an act of the General Assembly which fixed the number of school directors in cities of over three hundred thousand inhabitants, prescribing their qualifications, and determining the manner of their election and terms of office, was held not obnoxious to the Constitution as being a special or local law.

Whether or not an act of the legislature be a local or general law must be determined by the way in which it affects the people as a whole, rather than the extent of the territory over which it operates, and if it affects equally all persons who come within its range it is not a local or special law. In this case the proviso affects the business of insurance in all cities of a certain class. It does not grant to any corporation, association or individual any special exclusive right, privilege or immunity but applies alike to all fire insurance companies doing business in a certain class of cities. Nor is it class legislation. It relates to fire insurance companies as a class and is therefore a general law.

In Phillips v. Railroad, 86 Mo. loc. cit. 543, it is said: "In the determination of a question involving the constitutionality of a law, it is a settled rule for the guidance of courts that the acts of the legislature are presumed to be constitutional, and it is only where they manifestly infringe on some provision of the Constitution that they can be declared void for that reason. In case of doubt every possible presumption not directly inconsistent with the language and subject-matter is to be made in favor of the constitutionality of the act." See, also, State v. Able, 65 Mo. 357.

Oglesby v. Mo. Pac. R'y Co.

We can reach no other conclusion than that the act in question is valid.    If it be impolitic or unwise in its operation the remedy lies in the legislative branch of the State government, but the evidence adduced tends to show that as a result of the organization of boards of underwriters in large cities, and the acts and advice of their members, a very large proportion of all modern buildings erected therein are made almost fireproof, in consequence of which the rates of insurance on. such buildings and their contents, are much less than they would otherwise be, beside by the organization of their salvage corps vast amounts of property are saved from destruction by fires.

For these considerations it follows that the writs should be denied.    And it is so ordered.    All concur.