THE STATE ex rel. JOHN T. BARKER, Attorney-General, v. ASSURANCE COMPANY OF AMERICA et al.

In Banc, June 28, 1913.

1. CONSPIRACY IN RESTRAINT OF TRADE: Insurance Companies: Agreement to Withdraw from State. Foreign insurance companies, licensed to do business in this State, have a legal right, individually and of their own separate motion, to withdraw from the State, and to discontinue the writing of insurance contracts; but they do not have the right to enter into a joint agreement and confederation unitedly, on a day agreed upon, as the result of concerted action, to withdraw from the State and cease on that date to write insurance contracts, or unitedly to agree to cancel all contracts entered into by them. They have no more legal right to agree to do a lawful thing than they have to agree to do an unlawful act.

2. ————: ————: Anti-trust Law in Force April 28, 1913: Oliver Law. The law of 1911, known as the Oliver Act, did not repeal the anti-trust laws then in force, either directly or by implication, and if any words in it could be construed to repeal them by implication they were invalid because there were no words in the title of the Act of 1911 to indicate that its purpose was to repeal the existing anti-trust laws. The Act of 1911 did not permit insurance companies to conspire for the purpose of withdrawing from the State or of limiting the amount of insurance that may be written in the State or of refusing to write insurance contracts or of canceling existing policies; and while the Act of March 29, 1913, repealed the anti-trust laws, it' also re-enacted them, in every respect, except by the addition of one new section, and hence the anti-trust laws, namely chapter 98, R. S. 1909, were in force when this suit was brought on April 28, 1913.

3. QUO WARRANTO: Injunction as Ancillary. The Supreme Court has jurisdiction to issue a temporary injunction in aid of or ancillary to a *quo warranto* writ pending therein, in order to stop the mischief complained of and to preserve matters *in statu quo*. The Supreme Court is given express authority to try a *quo warranto*, and wherever a court is given ex-

press authority to try a cause it has the power to do all things that are incident to the trial, or that are necessary to be done in order to carry into full force and effect the judgment or decree the law authorizes the court to render. Where the Attorney-General charges, in an information in the nature of a *quo warranto*, that certain foreign insurance companies have entered into an agreement to unitedly withdraw from the State on a certain day, and to cease, by a concerted movement, to write insurance contracts in the State, and asks that said agreement be declared unlawful and void, and that respondents be fined for entering into it, the court can also issue a temporary injunction restraining said companies from withdrawing from the State and otherwise doing irreparable injury to the business of the State and from canceling existing policies, pending a trial of said information.

## Quo Warranto.

DEMURRER OVERRULED AND TEMPORARY INJUNCTION ISSUED.

*John T. Barker*, Attorney-General, and *W. M. Fitch*, Assistant Attorney-General, for relator.

*Judson, Green & Henry, Lehman & Lehman, Thomas Bates, Seymour Edgerton, Jones, Hocker, Hawes & Angert, Bruce Barnett* and *Clyde Taylor* for respondents.

WOODSON, J.—This is an information, in the nature of a *quo warranto*, instituted in this court, against the respondents, foreign fire insurance companies, duly authorized and licensed to do business in this State, to fine and otherwise punish them for violating the laws of the State regarding pools, trusts, conspiracies and discriminations.

The information charges that:

"The Amazonia Fire Insurance Company and others . . . are fire insurance corporations organized under the laws of other States or foreign countries, and are doing a fire insurance business in the State of Missouri, and at all the dates hereinafter mentioned were duly organized to do such business in the State of Missouri, having heretofore complied with the laws of the State of Missouri authorizing foreign fire insurance corporations to do business in this State; and at all times hereinafter mentioned respondents were engaged in the business of writing fire insurance contracts, policies and agreements insuring property from loss by fire or other causes, and conducting generally a fire insurance business throughout the State of Missouri; and that for many years respondents and each of them have been doing business in the State of Missouri with the consent of the State as foreign corporations and engaged in insuring property for the citizens and residents of Missouri against loss by fire and otherwise.

"That on the —— day of April, 1913, each and all of respondents unlawfully, illegally and wilfully misused and abused their said franchises, rights and privileges as foreign fire insurance companies authorized to do business under the laws of the State of Missouri in this, to-wit : that on said date each of said respondents did create, enter into, become a member of and participate in a certain pool, trust, agreement, combination, confederation or understanding with each other and with other fire insurance corporations and associations of persons (whose names are unknown) against public policy and in restraint of trade, in this, to-wit : that on said date each and all respondents unlawfully, illegally and wilfully entered into an agreement to suspend operation and with-

. draw from sale all fire insurance in the State of Missouri, on the 30th day of April, 1913, and unlawfully agreed to refuse to accept, write, issue or sell any insurance on any properties located in said State of Missouri, and unlawfully agreed to withdraw from said State of Missouri by concerted movement simultaneously on said 30th day of April, 1913, and thus leave the citizens of the State of Missouri without adequate fire insurance protection, and unlawfully agreed to cancel all fire insurance policies heretofore written in the State of Missouri, which said action on the part of said respondents, if carried out, as they now propose, will cause a calamity in the financial world in said State of Missouri and leave the citizens of said State without any adequate fire insurance.

"Your informant further informs the court that the said unlawful agreement, combination, confederation, and conspiracy will affect the trade, traffic and commerce in this State, and that the same will be hindered, injured and retarded and the people of the State, will, after said 30th day of April, 1913, be denied the right to purchase fire insurance and to protect themselves and their property against loss by fire.

"Your informant further informs the court that the general nature and object of the said combination, conspiracy and confederation, so made as aforesaid, is to act in a concerted manner, simultaneously, and with a view to crippling and destroying the financial credit of the State of Missouri and the people therein, and to deny to the State of Missouri and the people therein the right to protect their property by insurance against loss or damage by fire, and such conspiracy, confederation and agreement is against public policy, in restraint of trade, and is intended at one

blow to crush the entire business and commerce of the . commonwealth of the State of Missouri.

"Your informant further informs the court that respondents and each of them are associated together in a common organization or interest called the 'Western Insurance Bureau,' which bureau is organized for the purpose of controlling the insurance business of the United States and particularly in Missouri, and for the further purpose of controlling, managing, regulating and conducting the entire insurance business in the State of Missouri, and that respondents and each of them are members of such insurance organization and association, and by the scheme of said association and respondents and each of them such association is authorized and empowered to and does approve rules and regulations for the government of the entire association and all of the members thereof and of each and all of the respondents herein, and when said rules and regulations are so fixed, as they now are, each member and each respondent herein is called upon and required and compelled by the rules of said association and by the rules of the respondents herein to obey, and that said association and that each of respondents do obey such rules, and that when said respondents created, entered into and became a member of and participated in such illegal agreement and combination and understanding with each other and with such association to suspend business and withdraw all fire insurance from sale in the State of Missouri, and to withdraw by such concerted action from such State, each of said respondents are required and commanded, by the rules and understanding between the said association and respondents and each of them, to comply therewith, and to suspend operation in said State of Missouri and to withdraw therefrom and to withdraw from sale all fire insurance in said State, and such understanding, agreement, confederation and combination is an abuse of

the corporate privileges of each of said respondents
and in violation of the laws of the State of Missouri,
against public policy and is in restraint of trade.

"Your informant further informs the court that
there has been promulgated by said association and
by each of respondents herein, and approved by such
association and by each of respondents herein, rules
for the control of the members thereof, by which it is
provided that no member of such association of in-
surance companies, including each of the respondents
herein, shall write or sell insurance in the State of
Missouri after April 30, 1913, and each of said re-
spondents, as members of such insurance association
and individually has illegally agreed to suspend opera-
tion and withdraw from sale all fire insurance in said
State of Missouri on said April 30, 1913, and to with-
draw in a concerted movement from said State of
Missouri, and that by the rules of such association
each and all of the respondents herein are compelled
and required to withdraw from said State of Mis-
souri, and to suspend operation therein and to with-
draw from sale all fire insurance in said State, so that
said association of insurance companies and the re-
spondents herein have placed in the power of such in-
surance association to authorize and compel each in-
surance company named herein to immediately with-
draw from said State of Missouri, and to suspend
operation therein and to withdraw from sale all fire
insurance in said State, thus leaving the people of
the State of Missouri without any protection against
loss by fire, and to prevent citizens of the State of
Missouri from securing any fire insurance and thus
injure and destroy the commercial value of the State
of Missouri, and to deprive the citizens of said State
of Missouri of the right which they have heretofore
enjoyed of having their property insured by said re-
spondents or either of them, against loss by fire, and
that each of said respondents entered into such illegal

agreement with the express and avowed purpose of injuring and destroying the credit and commercial value of the State of Missouri.

"Your informant further informs the court that the object and purpose of such association which met as aforesaid on April —, 1913, was and is to stifle competition in the insurance business in the State of Missouri by withdrawing its membership and refusing to write insurance and thus lessen competition in the insurance business in said State of Missouri, and to deny to the citizens of said State of Missouri the right to purchase fire insurance, and each and all members of such association and the respondents herein are banded together for a common cause to injure and destroy the value of property in the State of Missouri and are acting in a rebellious and retaliatory manner and are now threatening to immediately suspend operation and to withdraw from the State of Missouri in a concerted movement on the 30th day of April, 1913, and that respondents and each of them are now actively and earnestly engaged in carrying out said purpose by the use of every means known to them, and are now preparing to and are suspending business and withdrawing fire insurance from sale in the State of Missouri, and are refusing, by reason of such concerted movement and for the purposes aforesaid, to insure property against loss by fire in the State of Missouri.

"Your informant further informs the court that these respondents and each of them in order to carry out the scheme of such association to create a monopoly in the insurance business in the State of Missouri and lessen competition have combined and conspired and confederated with each other and with other members of said association (whose names are unknown) and with the officers and agents and members of other associations in similar insurance business, and organized for a similar purpose, to harass and embarrass

the citizens of the State of Missouri, and to injure and destroy the business of the citizens of the State of Missouri and to destroy the commercial credit of the State of Missouri and thus create a financial panic in said State of Missouri and a calamity which will affect each and every citizen of the State of Missouri of the right to purchase insurance on his buildings and other property.

"Your informant further informs the court that in furtherance of such illegal conspiracy and agreement on the part of respondents these respondents and each of them and the association aforesaid have issued circulars containing declarations that they will suspend operation in the State of Missouri, and withdraw therefrom, and refuse to write or sell insurance therein, and that they will cause all members of said association, including each of respondents, to cease from writing or selling insurance in the State of Missouri and to cause them to suspend operation therein, thus leaving the people of the State without any fire protection, and that respondents, in pursuance of such illegal understanding, agreement and conspiracy, are now threatening to withdraw from the State of Missouri by a concerted movement on April 30, 1913, and are threatening to refuse to write or sell insurance on property in the State of Missouri after such date.

"Your informant further informs the court that the respondents herein constitute practically three-fourths of the fire insurance companies doing business in the State of Missouri and perhaps more, and that by reason of such illegal acts and conduct on the part of the respondents and each of them, coupled with their recent threats to withdraw from the State of Missouri, the people of this State will be left without any fire protection and the business of the State and of the citizens therein will be seriously impaired, the commercial loan value of buildings destroyed, and the citizens will be denied the right to protect them-

selves against loss by fire, and that each of said agreements and each of them is in restraint of trade, against public policy, and in violation of the law.

"Your informant further informs the court that by reason of the premises said respondents and each of them since the —— day of April, 1913, and up to the present time, grossly offended against the laws of this State and wilfully and flagrantly abused and misused their rights, authority and franchises and have wilfully and unlawfully assumed and unlawfully and wilfully usurped authorities and privileges not granted to said corporation by the laws of the State of Missouri, by entering into and becoming a member of said trust, combination, confederation, agreement and understanding as aforesaid; and in pursuance of the aforesaid agreement, combination, trust, confederation and understanding so made and maintained as aforesaid, respondents are now, in the State of Missouri, unlawfully and wilfully carrying out the provisions of said combination and confederation and threatening to leave the State of Missouri and to suspend business therein and to withdraw fire insurance from sale in said State on said 30th day of April, 1913, thus leaving the citizens of this State without any protection against loss by fire, and are now unlawfully and wilfully attempting to carry out such unlawful agreement, combination and understanding, and that the acts and agreements of the respondents, insurance corporations, as herein set forth, constituted a wilful and malicious perversion of the franchises granted to said insurance corporations by the State of Missouri, and is an illegal and wilful usurpation of privileges and authorities not granted said respondents by the State of Missouri, to the great and permanent injury of the entire public.

"Wherefore, your informant, prosecuting in this behalf for the State of Missouri, asks that each of these respondents be adjudged guilty of creating, en-

tering into and becoming a member of and participat-ing in a certain pool, trust, agreement, combination, confederation or understanding with each other and other fire insurance corporations, and that such agreement, understanding and conspiracy, so entered into, be declared illegal and void, and respondents and each of them be forbidden to again enter into such illegal agreements, combinations and confederations and that their acts in becoming members of such combination, confederation and understanding be declared void, and that respondents, and each of them, be fined in such sum as the court thinks will punish them, and cause others to refrain from doing similar acts, and that the court will restrain respondents and each of them from canceling, in pursuance of this illegal agreement, all policies or agreements of insurance heretofore issued, or direct respondents, and each of them, to show cause why they should not be thus restrained, and for such other and further orders and relief as to the court shall seem meet, just and proper."

Upon the filing of this information this court, by an order duly made on April 28, 1913, required respondents and each of them to show cause why they and each of them should not be adjudged guilty as charged in the information of a conspiracy in violation of their charter powers and licenses for their acts as aforesaid; and in addition to such order to show cause, the respondents and each of them were restrained and enjoined, individually and as parties to such illegal conspiracy, agreement and understanding, from canceling any and all policies in force in this State in pursuance of and by reason of such illegal agreement. The respondents and each of them were given until the 8th day of May, 1913, on which to respond to said order to show cause, and also in which to show cause why a temporary injunction should not be issued against the respondents and each of them,

to prohibit them and each of them from canceling the insurance now in force on property in this State under and in pursuance of such illegal agreement.

All of the respondents were duly served with process, and all appeared by counsel.

On the 8th day of May, 1913, the defendants, the Stuyvesant Insurance Company and the Pacific Fire Insurance Company, filed their answers by their respective attorneys, and all of the other defendants appeared and filed their general demurrer to the bills and complaints of the State.

The Massachusetts Fire and Marine Insurance Company appeared for this purpose by their attorneys, Jones, Hocker, Hawes & Angert.

The St. Paul Fire and Marine Insurance Company appeared by their attorney, Clyde Taylor.

The Buffalo-German Insurance Company appeared by its attorney, Bruce Barnett.

All of the other respondents appeared by their attorneys, Judson & Green, F. W. Lehman, Thos. Bates et al., and filed their general demurrers herein.

The grounds of the demurrer are:

First: That the petition does not state facts sufficient to constitute a cause of action against them or any of them.

Second: That the State is not entitled to the relief prayed for, or any other relief in this cause.

Third: That there is no law prohibiting the defendants or any of them from entering into the agreement of the nature set out in the information.

I. At this stage of the case there are only two legal propositions presented for determination, and they are presented by the demurrer. The first is, Does the petition state facts sufficient to constitute a cause of action? and the second, Has this court the authority to issue a restraining order or injunction in aid of a cause of action which this court has jurisdiction to hear and determine?

We will dispose of these questions in the order stated.

Attending the first:    Counsel for respondents clearly and tersely state their position regarding this proposition in the following question propounded, viz.:    "Must foreign insurance companies doing business in this State, continue to do such business, even though they are unwilling to accept the terms and conditions prescribed by the statute upon which the business may be done, and especially where, as here, those terms and conditions were radically changed by the State after the companies came into its jurisdiction and the companies have never assented to the change?"

Quo Warranto: Insurance Companies: Concerted Agreement to Withdraw from State.

As an abstract legal proposition, no court, in my opinion, would hesitate a moment to answer that question in the negative; but that question does not incorporate the entire case presented by the information filed by the Attorney-General. In other words, his charges are broader than the question, in this: He charges that the "respondents did create, enter into, become a member of and participate in a certain pool, trust, agreement, combination, confederation or understanding with each other and with other fire insurance companies and associations of persons (whose names are unknown) against public policy and in restraint of trade, in this, to-wit: that on said date each and all respondents unlawfully, illegally and wilfully entered into an agreement to suspend operation and withdraw from sale all fire insurance in the State of Missouri, on the 30th day of April, 1913, and unlawfully agreed to refuse to accept, write, issue or sell any insurance on any properties located in said State of Missouri; and unlawfully agreed to withdraw from said State of Missouri by concerted movement simulta-

neously on said 30th day of April, 1913, and thus leave the citizens of the State of Missouri without adequate fire insurance protection, and unlawfully agreed to cancel all fire insurance policies heretofore written in the State of Missouri, which said action on the part of said respondents, if carried out, as they now propose,'' would cause great damages, etc., to the State and the citizens thereof.

By this language, it is seen that the Attorney-General does not seek to prevent any one or all of the respondents acting for itself or themselves individually, upon its or their own volition, from leaving the State or to prevent such company or companies, if so acting, from canceling any or all of their policies insuring property in this State; but he does seek to prevent respondents from leaving the State in a body or as a body to cancel all of their policies in this State in pursuance to the unlawful, illegal and wilful conspiracy he alleged they have entered into for the purpose of damaging the State and the citizens thereof.

There is a broad distinction between the two propositions. Under the former each and every one of the respondents may individually, of its own motion, leave the State and cancel each and every policy it has in force therein, if it sees proper to so do, provided of course, the policy contains a provision permitting its cancellation. But this is not true under the latter proposition, because respondents have no more legal right to unlawfully agree to do a lawful thing, than they have to agree to do an unlawful act. [State ex inf. v. Standard Oil Co., 218 Mo. l. c. 367, and cases cited.]

If any one or more of the respondents feels itself or themselves aggrieved because of the enactment of the statutes of 1913, known as and called the ''Orr Acts,'' then there is no valid reason, legally or morally, why it or they should not be permitted to leave the State, but in doing so, they have no legal or moral right to enter into an unlawful conspiracy with them-

selves or with other companies and by agreement in pursuance thereof induce or agree with all the others to leave in a body or severally, for that matter, if it is, as stated, done in pursuance to such unlawful conspiracy.

The principle of law is so well settled in England and America, under both the common law and the statutes governing the same, it seems to me that it would be useless to cite authorities in support thereof.

Since writing the above, it has occurred to my mind that the writer had occasion to consider the principle underlying this case, in the case of Lohse Patent Door Company v. Fuelle, 215 Mo. 421. That case involved the questions of unlawful conspiracies to injure others, and the authority of the court to resort to injunctive relief in aid thereof.

Counsel for respondent, in that case, cited the case of Hunt v. Simonds, 19 Mo. 583, which seems to hold to the contrary, but we refused to follow the doctrine announced in that case, and followed the better considered cases, which are as old as the common law, which hold that two or more persons have no legal right to unlawfully conspire to injure another, even though each separately had the legal right to do what the combination had agreed to do.

We are, therefore, of the opinion that the respondents had no legal right, by agreement, to withdraw from the State, in a body, in pursuance to said unlawful agreement, or to cancel their policies upon property in this State in pursuance to said agreement.

II. If we correctly understand the position of counsel for respondents, they do not, as a general proposition, seem to controvert the proposition stated and conclusions reached in paragraph one of the opinion, but insist that, at the time of the making and entering into the agreement or conspira-

Combinations:
Insurance
Laws of 1913.

cy complained of, there was no law in this State, which prevented them from so doing.

This insistence, in our opinion, is untenable.

Prior to 1911 the business of fire insurance was by express terms included within the anti-trust laws of the State. See chapter 98, Revised Statutes 1909. This chapter placed under the ban "any pool, trust, agreement . . . to regulate, control or fix . . . . the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm, or to maintain said price when so regulated or fixed." This statute was sustained as valid and applying to insurance companies in State ex inf. v. Insurance Cos., 150 Mo. 113.

This chapter, it is insisted, in so far as it related to insurance companies, was repealed in 1911 by what was known as the "Oliver Law." [Laws 1911, pp. 267-271.]

We must, therefore, consider the following matters as a basis for this proceeding, as to whether or not the anti-trust laws are in force in this State, as regards insurance companies so as to prohibit them from entering into the agreement complained of in the information filed by the Attorney-General in this case.

Counsel for respondents contend that the "Oliver Law" (Laws 1911, pp. 267-271, secs. 1 to 12 inclusive) repealed all prior laws of the State applicable to that subject, which are contained in article 1, chapter 98, Revised Statutes 1909, entitled, "Pools, Trusts, Conspiracies and Discriminations."

The Oliver Act which was approved March 18, 1911, does not purport in terms to repeal any pre-existing laws, but upon the contrary, section 11, by necessary implication, repels any such conclusion to be drawn therefrom, for it in express terms provides that "all laws and parts of laws in conflict with this act are hereby repealed," and consequently all laws and parts of laws not in conflict therewith are not re-

pealed thereby, but are left in full force and effect. That is the common sense of the language used, and the clear design the Legislature had in mind when it enacted it.

The Oliver Act, however, was in express terms repealed by an act of the Legislature, approved March 29, 1913. [Laws of 1913, p. 382.] And an act of the Legislature approved March 29, 1913 (Laws 1913, pp. 549 to 555 inclusive), repealed article 1 of chapter 98, Revised Statutes 1909, composed of sections 10299 to 10313, both inclusive, entitled, "Pools, Trusts, Conspiracies and Discrimination," and re-enacted in lieu thereof, an act to be known as article 21, chapter 98, Revised Statutes 1909, entitled "Pools, Trusts, Conspiracies and Discriminations."

The only difference between the article repealed and the one enacted is, that the latter added to the former a new section numbered 10313a.

This new section prescribes what shall be prima facie evidence of guilt in prosecutions of insurance companies for violating the provisions of said article, but what the object or purpose of the framer of the bill was, or the intention of the Legislature in enacting it, is not clear, for if the Oliver Act repealed said article 1, as counsel for respondent contend, then there was no useful purpose served by the Legislature repealing it again on March 29, 1913, and if not repealed thereby, then I can see no wise purpose in repealing it in one breath and re-enacting it in the next.

But whatever may have been the purpose of the Legislature in so acting it has but little or no bearing upon the question in hand, namely: Were there any anti-trust laws in force in this State at the date of the formation of the conspiracy complained of in the information?

By reading the Oliver Act, it will be seen that neither the title thereto nor the body of the bill mentions or refers to pools, trusts, conspiracies or discrim-

inations, nor to the chapter or article of the statutes containing said laws.

It is therefore perfectly clear to my mind that the Legislature had no such purpose in view.

But suppose it be conceded that the Legislature did intend thereby to repeal the anti-trust laws of the State in so far as they relate to fire insurance companies, then the act would be unconstitutional, null and void, because there is nothing contained in the title of the bill calling that subject to the attention of the legislators, as commanded by section 28 of article 4 of the Constitution, which, in so far as is here material, reads as follows: "No bill . . . shall contain more than one subject, which shall be clearly expressed in its title."

The title of the act reads: "An Act to regulate insurance against loss or damage by fire, lightning, hail, windstorm and sprinkler leakage, and the rates of premium thereon and to provide penalties for the violation of its provisions, with an emergency clause."

Clearly there is nothing in this title that points to the anti-trust laws of the State, like a signboard points to a city, as was stated by SHERWOOD, J., in the case of St. Louis v. Weitzel, 130 Mo. 600, l. c. 616, in the following language:

"The evident object of the provision of the organic law relative to the title of an act was to have the title, like a guide board, indicate the general contents of the bill, and contain but one general subject which might be expressed in a few or a greater number of words. If those words only constitute one general subject; if they do not mislead as to what the bill contains; if they are not designed as a cover to vicious and incongruous legislation, then the title can stand on its own merits, is an honest title and does not impinge on constitutional prohibitions."

But independent of that, there is nothing contained in the body of the Oliver Act which can form

even a plausible basis for the contention that it repeals the anti-trust laws of the State, in so far as they refer to fire insurance companies, unless it is the following language contained in section 4 thereof, which reads as follows:

"Provided further . . . any one or more of such companies singly or jointly may employ for the making of such general basis schedules and rates and the filing of the same the services of such experts as it, or they, may deem advisable for such purpose."

Should it be conceded that it was the design of the Legislature, by this provision of that section, to repeal the anti-trust laws in so far as authorizing the companies in making and fixing rates are concerned, yet there is nothing contained in this record which shows that respondents or any of them have availed themselves of that clause by complying with its provisions in reference to filing with the Insurance Commissioner general and special schedules of rates for each city, town or village in the State, etc. But waiving that point, and conceding that they have fully complied with all of said act; yet it cannot be seriously contended that said clause of said section four of the Oliver Act repeals anything contained in the anti-trust laws, except that clause of section 10301, Revised Statutes 1909, which forbids all agreements among insurance companies to fix the "price or premium to be paid for insuring property against loss or damage by fire, lightning or storm," etc., yet that act does not authorize them to combine or conspire for the purpose of charging a fixed rate irrespective of the ruling of the Insurance Commissioner as to the reasonableness of that rate; nor does it authorize them to conspire for the purpose of withdrawing from the State or to limit the number of companies which shall do business herein; nor for the purpose of preventing the writing of all insurance available or limiting the amount of insurance that may be written in the State;

nor for the purpose of canceling any or all insurance now in force herein. This is too plain for argument.

Moreover, when we consider the growth and great evils of the trusts and combines, and the legislation enacted, in almost if not all of the States and Territories of the Union and by the Congress of the United States, to suppress and destroy them, it is almost inconceivable to believe that it was the design of the Legislature of this State, at a single stroke, to repeal all laws regarding this, one of the oldest and greatest trusts that exists in the country.

If I remember correctly this is one of the first trusts this court declared was illegal, and in consequence thereof imposed heavy fines against the various companies which were members thereof.

I am, therefore, firmly of the opinion that not only the anti-trust laws of the State, common law or statutory, are in full force and effect, but also that the information filed charges a good cause of action against the respondents.

III. This brings us to the consideration of the question, has this court the jurisdiction to issue a restraining order or temporary injunction which is in aid of or ancillary to the *quo warranto* proceeding pending herein?

Quo Warranto: Aided by Injunction.

When this question was first suggested, I was of the opinion that we had no such authority, but after a thorough investigation of the question I have changed my mind and am now of the opinion that this court has that power.

Mr. High, in his estimable work on Injunctions (4 Ed.), pages 7, 8 and 11, sections 4, 5 and 7, in treating of temporary injunctions, among other things, says:

"4. The sole object of an interlocutory injunction is to preserve the subject in controversy in its then

condition, and, without determining any question of right, merely to prevent the further perpetration of wrong, or the doing of any act whereby the right in controversy may be materially injured or endangered. It cannot be used for the purpose of taking property out of the possession of one party and putting it into the possession of another, nor does it go to the extent of ordering defendant to undo what he has already done, since it might thereby be productive of as much injury to defendant as that of which the party aggrieved complains. The jurisdiction, therefore, being exercised to prevent the further continuance of injurious acts, rather than to undo what has already been done, on an interlocutory application for an injunction, courts of equity will only act prospectively, and will interpose only such restraint as may suffice to stop the mischief complained of and preserve matters *in statu quo*. And where the granting of an interlocutory injunction involves the decision of a novel question of law of grave importance and serious difficulty, the injunction should be denied. And the court should not, upon an interlocutory application, enter a final decree granting a perpetual injunction.

"5. It is to be constantly borne in mind that in granting temporary relief by interlocutory injunction, courts of equity in no manner anticipate the ultimate determination of the questions of right involved. They merely recognize that a sufficient case has been made out to warrant the preservation of the property or rights in issue *in statu quo* until a hearing upon the merits, without expressing, and indeed without having the means of forming a final opinion as to such rights. And in order to sustain an injunction for the protection of property *pendente lite* it is not necessary to decide in favor of plaintiff upon the merits, nor is it necessary that he should present such a case as will certainly entitle him to a decree upon the final hearing, since he may be entitled to an interlocutory

injunction, although his right to the relief prayed may ultimately fail. Nor is the decision of the court in granting or refusing a preliminary injunction conclusive upon either the court or parties on the subsequent disposition of the cause by final decree. . . .

"7. Except in cases of special injunctions to stay waste or prevent other irreparable injury, the bill should generally show some primary equity in aid of which the injunction is asked, and the relief is granted as ancillary to or in support of the primary equity whose enforcement is thus sought. And it is incumbent upon the party seeking relief by interlocutory injunction to show some clear legal or equitable rights, and a well grounded apprehension of immediate injury to those rights."

The information in this case charges the respondents with a violation of the anti-trust laws of the State, and that thereby they have usurped authority and powers not granted to them by their licenses to do business in this State, for which the Attorney-General asks that they be fined and otherwise punished; and in addition thereto the information charges that respondents in pursuance to said usurpation and abuse of power, are threatening to and will commit an irreparable injury to the State and the citizens thereof, if not restrained or enjoined from so doing during the pendency of the suit.

A similar question came before the Supreme Court of Ohio in the case of State ex rel. v. Board of Supervisors, 70 Oh. St. 341. In that case, as in this, it was contended by the respondents that under the Constitution of that State, the Supreme Court had no jurisdiction to issue a temporary injunction in aid of the *quo warranto* proceeding therein pending. The Constitution of Ohio in regard to issuing original writs is practically the same as ours, and neither in express terms authorizes the Supreme Court to issue an injunction; but that court held that it had the im-

plied or inherent authority to issue an injunction in aid of a *quo warranto* proceeding pending therein, which it unquestionably had jurisdiction to try and determine. In discussing that question the court said:

"It is urged that we are without authority to make the order which the motion contemplates. The present action is a resort to our original jurisdiction. That we have not original jurisdiction of suits for injunctions is entirely clear. If the language of section 5573, Revised Statutes, should be thought appropriate to confer it, the effect to be given to that section would, nevertheless, be indicated by section two of article four of the Constitution, which ordains that 'it [the Supreme Court] shall have original jurisdiction in *quo warranto, mandamus, habeas corpus* and *procedendo,* and such appellate jurisdiction as may be provided by law.' Applying to this grant the maxim, *Expressio unius est exclusio alterius,* the conclusion is irresistible that the General Assembly cannot add to the enumerated subjects of our original jurisdiction. [Marbury v. Madison, 1 Cranch, 49; Kent v. Mahaffy, 2 Ohio St. 498.] But our original jurisdiction in *quo warranto* is not doubted, and we have to inquire whether the desired order may be made in its exercise. In the consideration of that question the case of Yeoman v. Lasley, 36 Oh. St. 416, is suggestive. The proceeding in this court was for the reversal of a judgment which the district court had rendered in a suit for the foreclosure of a mortgagor's equity of redemption. An injunction was not sought in the original suit, nor was a right to that relief presented to the court below or considered by it. The question for ultimate determination by this court was whether the district court had erred in the decision of the case which has been presented to it. But this court, upon an application originally made here, allowed an injunction in favor of one of the parties to the proceeding in error and against his adversary for 'the protec-

tion of the rights of the parties in the suit or matter under review, on error.' It is true that it is said in the opinion that in allowing the injunction the court was exercising appellate, and not original, jurisdiction. But as it was not a part of the jurisdiction invoked by the suit and exercised or refused by the district court, it could be regarded as appellate jurisdiction only because the order to be made was necessary to the proper and effective exercise of the appellate jurisdiction to reverse the judgment which the district court had rendered in the suit to foreclose. It has not been suggested, and it obviously could not be maintained, that our authority for the exercise of the original jurisdiction which the Constitution confers upon us is less complete than for the exercise of the appellate jurisdiction which we derive from the statutes. The pertinent inference from the case cited is that a court has authority to make any judicial order which, from the nature of the case, may be necessary to the effective exercise of its jurisdiction, whether original or appellate. Jurisdiction is the power to hear and determine the subject-matter in controversy between the parties to a suit. Authority to determine is exercised in the form of judgments, decrees and orders, and it implies power to make all such orders as may be appropriate to the case presented and necessary to give practical effect to the final judgment, as well as to preserve the subject of the action, pending the final determination of the case. In Kerr at al. v. Trego, 47 Pa. St. 292, it is appropriately said that 'all bodies, except the Legislature, are under law, and therefore for all transgressions of the law are subject to the judicial power established by the Constitution.' This is a public action, and its subject is the administration of the laws which provide for the conduct of popular elections. The more limited subject of inquiry started by this motion is the administration of those laws

pending the case in *quo warranto*. Since the principal action involves its incidents, the court of common pleas, which alone has original jurisdiction of suits for injunctions, cannot with propriety exercise that jurisdiction with respect to the subject of the action which is pending here; and it is entirely clear from the decisions already adverted to, as well as from the obvious force of the reasons involved, that those having the apparent right should be protected in the exercise of these public functions. The power to grant an ancillary injunction for that purpose is inherent in the court which has jurisdiction of the principal subject. The case is novel only in the application of familiar principles of obvious necessity.''

That ruling, in my opinion, is unquestionably correct, for it would be useless for a court to try a cause if it had no authority or means by which it could enforce or protect the rights and interests of the parties involved therein after they had been adjudicated.

It seems to me to be unanswerable to say that where a court is given express authority to try a cause, it must also by implication, have the power to do all the things that are incident to that trial, or are necessary to be done in order to carry into full force and effect the judgment or decree the law authorizes the court to render therein. [Shull v. Boyd, 251 Mo. 452.]

It is not doubted but that this court has jurisdiction to try and determine a *quo warranto* proceeding, which this is, and if it is necessary, as it appears to be by the information filed in this case, to preserve the *statu quo* of the parties to the suit and the rights involved therein to issue a temporary injunction during the pendency of the proceedings, in order that full force and effect may be given to the judgment which may be rendered herein, then I think the court has the implied, if not the inherent power, to issue a temporary injunction in aid of the *quo warranto* proceeding.

I am, therefore, of the opinion that the demurrer should be overruled, and that a temporary injunction should issue.

All concur as to paragraphs one and two, except *Walker, J.,* who dissents from the opinion *in toto; Bond, J.,* concurs in result; *Lamm, C. J.,* and *Graves,* and *Bond, JJ.,* concur in the third paragraph; *Brown, Walker* and *Faris, JJ.,* dissent as to the third paragraph.