STATE OF MISSOURI, on the Information of ROY MCKITTRICK, Attorney General, Relator, v. AMERICAN INSURANCE COMPANY, a Corporation, et al.—140 S. W. (2d) 36.

Court en Banc, May 7, 1940.

270

*Roy McKittrick,* Attorney General, and *Covell R. Hewitt* and *Harry H. Kay,* Assistant Attorneys General, for relator.

*Morrison, Nugent, Berger, Byers & Johns* and *Harding, Murphy & Tucker* for respondents; *William Marshall Bullitt,* special counsel.

PER CURIAM:—This is an original proceeding in the nature of *quo warranto* on information of the Attorney General. The question now to be decided is whether this court has any jurisdiction of the subject matter of this information.

Respondents, in separate pleas to the jurisdiction, asserted that "the District Court of the United States for the Western District of Missouri, Central Division, has sole and exclusive jurisdiction of the subject matter of this proceeding and the issues with respect thereto." This court, on September 5, 1939, appointed Hon. Samuel A. Dew as Special Commissioner "to take evidence upon the plea to the jurisdiction," and "to report the evidence taken, together with his findings of fact and conclusions of law on the issue of the plea to the jurisdiction." The pleadings herein, evidence taken by the Special Commissioner, and his report, shows the following material facts on the issue of jurisdiction now involved. On October 9, 1922, Superintendent of Insurance, Ben C. Hyde, ordered a 10 per cent reduction of rates on fire, lightning, hail and windstorm insurance, effective November 15, 1922. Litigation over the validity of this order lasted into 1929. [See Aetna Life Insurance Co. v. Hyde, 315 Mo. 113, 285 S. W. 65; Id., 273 U. S. 681, 47 Sup. Ct. 113, 71 L. Ed. 837; Id., 275 U. S. 440, 48 Sup. Ct. 174, 72 L. Ed. 357; Aetna Life Insurance Co. v. Hyde (D. C.), 34 Fed. (2d) 185; National Fire Insurance Co. v. Thompson, 281 U. S. 331, 50 Sup. Ct. 288, 74 L. Ed. 881.] On August 8, 1929, after this order had been upheld, a reduction of rates to apply as of February 1, 1928, in accordance with the original 1922 order, was filed under protest by respondents. Superintendent of Insurance Joseph B. Thompson (appointed in 1929) acknowledged this filing to be under protest but notified respondents that premiums collected in excess of the 1922 order must be refunded. Thereafter, on December 30, 1929, respondents notified Superintendent Thompson that rates would be increased 16⅔ per cent, effective February 1, 1930, and requested his approval. On May 28, 1930, Superintendent Thompson made an order denying this increase, and, earlier on the same day, respondents filed in the U. S. District Court separate bills in equity against the Superintendent of Insurance and the Attorney General on grounds of inadequacy and confiscatory effect of rates and unconstitutionality of statutes authorizing their enforcement. Respondents obtained interlocutory injunctions authorizing them to collect the increased rates but requiring impounding with the court. Reference of these cases to a master then was made. On May 18, 1935, while these cases were pending in the U. S. District Court on exceptions to the master's report, Superintendent of Insurance, R. E. O'Malley (appointed in 1933) entered into an agreement for settle-

ment with respondents' agent C. R. Street. This agreement provided that Superintendent O'Malley would make an order, "retrospective to June 1, 1930," setting aside the refusal order of May 28, 1930, and approving four-fifths of the 16⅔ per cent rate increase; that one-fifth of the impounded funds should be refunded to policyholders; and that the remaining four-fifths should go to respondents or for outlays and expenses in connection with the litigation. After this settlement, and pursuant to it, new rates were filed and approved, effective November 11, 1935. This agreement and the order made pursuant thereto was later held void by this court. [American Constitution Fire Assurance Co. v. O'Malley, 342 Mo. 139, 113 S. W. (2d) 795; see also State ex rel. Robertson v. Sevier, 342 Mo. 346, 115 S. W. (2d) 810.] However, the U. S. District Court, on February 1, 1936, entered a decree providing for the distribution of the impounded funds in accordance with the agreement for settlement; but the court retained jurisdiction over all parties.

Under this decree, out of the impounded funds (amounting to $9,893,321.08) there was disbursed direct to respondents the total sum of $4,488,193.84, and to their trustees (for expenses, etc.) the sum of $2,702,789.15. On May 29, 1939, Superintendent of Insurance Ray B. Lucas (appointed in 1939, as successor to G. A. S. Robertson, appointed in 1937) filed a motion for citation to respondents to show cause why the decree of February 1, 1936, should not be set aside and the money disbursed to them and their trustees be paid back for distribution to policyholders. The grounds for this motion were "that said suits had been instituted through combination and common design on the part of the companies, with the intent ultimately to procure unlawfully the return to them of the invalid increase of rates collected; that experiences under said impounding order had demonstrated the adequacy of the rates as applied to the plaintiffs (respondents) when the suits were brought; that after five years of said impounding, plaintiffs (respondents), without the knowledge of their counsel, set about by means of a bribe to O'Malley, to obtain a return to them of the said funds; that they had agreed to contribute 5 per cent of said funds to pay one or more persons to influence an alleged settlement of said cases whereby plaintiff companies would procure a substantial portion of said fund; $440,500 had been so collected from said plaintiff companies with their knowledge that same was to be paid to the person or persons who could and would influence and procure such a settlement, or with such knowledge on their part as would have put them on inquiry which would disclose that the said purpose was either to bribe said O'Malley or to corrupt T. J. Pendergast, who had enough power and influence over said O'Malley to induce him to agree to said full settlement; that all but $500 of said amount had been collected and delivered to Charles R.

Street, agent of plaintiff companies at various times, and to A. L. McCormick, and that the latter promptly delivered same to T. J. Pendergast, who retained $315,000 thereof and paid $125,000 thereof to said McCormick with instructions to pay one-half thereof to R. E. O'Malley as a bribe; that by reason of said bribery and influence said O'Malley did enter into said agreement and signed the rate approval order mentioned.'' An order to show cause was made, and respondents filed answers thereto denying any part in or knowledge of the Street, McCormick, Pendergast and O'Malley bribery transactions, disaffirming all advantage arising from the settlement and decree, agreeing to restore the amounts paid to or for them, but reaffirming their claim to the fund and their right to prevail upon the merits. Respondents, prior to August 31, 1939, did repay to the U. S. District Court's custodian, $7,190,982.99, in accordance with its order of restitution. Superintendent Lucas filed motions to strike respondents' answers and the matter is still pending in the U. S. District Court upon reference to a Special Master.

Our Special Commissioner made the following finding as to the issues in the Federal Equity Cases and in this *quo warranto* proceeding:

· A.—*Classification of Issues in Federal Equity Cases.*

''The material issues in said Federal cases are divisible into two classifications:

'' (1) The legality, adequacy and finality of the last premium rates approved by the Superintendent of Insurance and applied to respondents prior to May 28, 1930; whether or not the same were confiscatory; whether or not as of the same date, the proposed increase of 16⅔ per cent would be reasonable and whether a refusal of such increase would be confiscatory and thereby unconstitutional; whether the denial of the proposed increase was legal and final or confiscatory; the matter of estoppel of the plaintiffs growing out of prior litigation; the matter of impounding collections of said increase with the court's custodian and the disposition of said impounded fund; and,

'' (2) The matters arising after the agreed judgment and decree, under the motion for citation, the court's order of restitution, order to show cause, and appointment of Master, having to do with the acts, conduct and knowledge of the respondents respecting the alleged events leading up to and including the order of distribution of the impounded fund, to-wit, purported settlement of the rate controversy involved therein, the agreement for settlement, stipulation and motion for decree, the decree, voluntary dismissal and transactions thereafter pertaining to the disposition of the impounded funds in the court's custody.''

B.—*Classification of Issues in Quo · Warranto Proceeding.*

''The material issues in the *quo warranto* proceedings, for the purposes of the special pleas to the jurisdiction herein, are likewise di-

visible into two classifications, partly similar in character to the above classifications of the issues in the Federal cases:

"(1) Matters having to do with the determination of what were legally approved rates of premium charges on May 28, 1930, at the time of the filing of said Federal cases; the legality and finality of such rates; the alleged unlawful charges in excess of such rates by the companies; and

"(2) All matters having to do with the alleged acts and conduct of the respondents, directly or indirectly, in common, in concert, or otherwise, with or without complete knowledge or such as to put them on inquiry which would have disclosed the facts, which acts and conduct are alleged to have caused or permitted political influence to be purchased with over $400,000.00 of funds furnished by the companies, whereby there were procured official approval by the Superintendent of Insurance of Missouri, by bribery or other unlawful means, of increased insurance rates, a favorable settlement of a rate controversy in litigation and an advantageous division of premiums impounded in court."

Our Special Commissioner reached the conclusion that the issues under classification I in the *quo warranto* proceeding are all pending before the U. S. District Court under the issues therein in classification I in the Federal equity cases; and that "as to such issues said Federal Court has prior and exclusive jurisdiction." He also concluded that the issues in classification 2 of the *quo warranto* proceeding are not exclusively pending in said Federal Court; and that (even though the inquiry under such issues would be similar to that under the issues under classification 2 in the Federal Court Equity Cases), "the inquiry as to the same in the *quo warranto* proceeding is for a different purpose, for different remedy and relief, and measured by a different gauge of accountability." The position of respondents, raised by their exceptions to this report, is that this court has no jurisdiction of any issue stated in this *quo warranto* proceeding, but that all of the matters raised therein are within the exclusive jurisdiction of the U. S. District Court.

The recommendation made by our Special Commissioner's report (and since no exceptions were filed to the report by the Attorney General, and its findings are accepted in his brief herein filed, it is the sole question for decision in this case) was, as follows:

"The following issues in the *quo warranto* proceeding and none other, are, therefore, within the jurisdiction of the Supreme Court of Missouri:

"Whether or not the respondents are guilty of acts and conduct, with complete knowledge or such knowledge as would put them on inquiry as would have disclosed the facts, in common, in concert or otherwise, which caused or permitted political influence to be purchased with the funds of the respondents, whereby official approval

by the Superintendent of Insurance of Missouri for rate increase was procured by bribery, or other unlawful means, as alleged, and a settlement agreement thereby obtained of a rate controversy in litigation favorable to respondents and a division of funds impounded in court advantageous to respondents, . . . (and) if established as alleged, may be found by the Supreme Court of Missouri to be *ultra vires,* unlawful or a misuser, abuse or perversion of charter powers or usurpation of powers not granted, and grounds for ouster of said corporations from doing business in Missouri, or for forfeiture of their charter, or a fine assessed against them as prayed.''

Respondents make the contention, which is sufficiently raised by their exceptions, that the issues of this *quo warranto* proceeding cannot be separated, but that all allegations are part of the one charge (which they say is the only charge actually made) of collecting excessive and illegal rates for fire and windstorm insurance. They also contend, even if ''fraud and bribery are pleaded as an independent ground for ouster,'' that such allegations are not sufficient to authorize ouster because, while ''persistent and repeated violations of the criminal laws'' could be proper grounds for ouster, ''a single such violation is not sufficient.'' In short, on their plea to jurisdiction, they stand on the proposition that the Attorney General's claim is that they only bribed O'Malley once.

As to the first proposition, we think it is clear that, if we disregard the allegations concerning the merits of the 16⅔ per cent increase and the ownership of the impounded funds, the Attorney General's information alleges sufficient facts to show another and separate transaction. That transaction alleged was that respondents ''entered into an agreement, conspiracy, combination and confederation'' to pay money to Pendergast to influence O'Malley and to bribe O'Malley to stop opposition on the part of the State and interested insurance policyholders to respondents' rate increases, and to settle their claims against the impounded funds, and to obtain new increased rates (effective November 11, 1935) for the future by such bribery. Regardless of whether or not respondents were entitled to win the 16⅔ per cent rate controversy, or any part thereof, on the merits, they had no right to obtain such an agreed settlement and new rates by bribery of the public official who represented the interests of the State of Missouri in this controversy. What should be done about such conduct is for the courts of this State to determine. We hold that such a separate transaction is sufficiently stated in the information as a ground for ouster.

Does *quo warranto* lie for a single illegal act? We think that this depends upon the nature of the act, even considering the alleged combination and conspiracy as a single act. Respondents cite no case that directly holds *quo warranto* will not lie for one act, no matter how inimical to the State and the public welfare; and we find this

statement in 13 Am. Jur. 1171, sec. 1309, to-wit: "Although some cases intimate that the acts of omission or commission must be repeated or continued to constitute a cause of forfeiture, it is the prevailing view that a single act of abuse or willful nonfeasance may be insisted on as a ground of forfeiture." This court, in State ex inf. McKittrick, Attorney General, v. Globe-Democrat Pub. Co., 341 Mo. 862, 110 S. W. (2d) 705, recently entered judgment (assessing a fine) against a respondent in a *quo warranto* proceeding for operating a lottery. Respondent, in that case, was only operating one lottery, and there was nothing to show that it had ever operated a lottery before or had any intention of operating another one. We also recently ruled, in State ex inf. McKittrick v. Wymore, 345 Mo. 169, 132 S. W. (2d) 979, that "the character of judgment in *quo warranto* cases is largely within the discretion of the court;" and that in the case of public officer, prosecuting attorney, although serving a second term by re-election, a fine should be assessed against him for misconduct during his first term which constituted grounds for forfeiture and ouster during his first term. As against corporations, this court years ago established the principle that both ouster and fine could be adjudged against a corporation for acts in violation of the criminal laws of this State, and such decisions have been upheld by the Supreme Court of the United States. [State ex inf. Hadley v. Delmar Jockey Club, 200 Mo. 34, 37, 92 S. W. 185, 98 S. W. 539; Delmar Jockey Club v. Missouri, 210 U. S. 324, 28 Sup. Ct. 732, 52 L. Ed. 1080; State ex inf. Hadley v. Standard Oil Co., 218 Mo. 1, 116 S. W. 902; Standard Oil Co. v. Missouri ex rel. Hadley, 224 U. S. 270, 32 Sup. Ct. 406, 56 L. Ed. 760.] In the Standard Oil case, the United States Supreme Court pointed out that in *quo warranto* against a corporation, "the state proceeds for violation of the company's private contract;" namely, "the corporation's implied contract not to violate the franchise granted by the state," which means that it will comply with the general laws of the State as well as with express conditions of the grant of the right to carry on its business as a corporation.

Conduct of officers and agents of a corporation, which is criminal under the laws of the State, is both a violation of the criminal law by the individual (and in some instances also by the corporation), for which there may be prosecution by criminal information or indictment, and also a violation of the implied contract of the corporation with the State for which its charter or franchise may be forfeited in *quo warranto* proceedings. Instead of, or in addition to, forfeiture and ouster, a fine may be assessed, which the United States Supreme Court said in the Standard Oil case, "is within the principle which permits the recovery of punitive damages . . . where the defendant has acted wantonly or perversely, or with such malice as implies a spirit of mischief or criminal indifference to civil obliga-

tions.'' Does a corporation have to violate its contract more than once to be subject to such fine or forfeiture? When there has been a flagrant, inexcusable, malicious violation of its criminal laws, does the State have to wait until the parties do it again? We will not hold that this State is so powerless to protect its citizens and the public welfare. On the contrary, we hold that once is enough (and too much) if the act is a clear inexcusable violation of our criminal laws.

Is the act herein alleged of such nature and character as to authorize granting the relief sought by the State, in this proceeding, of declaration of a forfeiture or assessment of a fine? In the first place, our insurance code clearly contemplates some competition as to making rates for fire and windstorm insurance. Approval of the Superintendent of Insurance is required for raising rates, but not for lowering them. [Sec. 5864, R. S. 1929, 6 Mo. Stat. Ann. 4476.] Agreements or understanding between companies to maintain rates is prohibited. [Sec. 5861, R. S. 1929, 6 Mo. Stat. Ann. 4475.] Each company is required to maintain its own separate rating record (Sec. 5860, R. S. 1929, 6 Mo. Stat. Ann. 4474) and in rate increase proceedings each company must make its own showing because ''the question must be determined from the individual experience of the company asking the increase.'' [American Constitution Fire Assurance Co. v. O'Malley, 342 Mo. 139, 113 S. W. (2d) 795; see, also, Aetna Ins. Co. v. Hyde, 275 U. S. 440, 48 Sup. Ct. 174, 72 L. Ed. 357.] In State ex inf. McKittrick v. American Colony Ins. Co., 336 Mo. 406, 80 S. W. (2d) 876, we held *quo warranto* to be a proper remedy to oust insurance companies of the privilege of charging increased rates, which had not been approved by the Superintendent of Insurance, when, as to this same 16⅔ per cent rate increase, evidence showed that ''a large number of companies acting together made a state-wide increase in rates.'' Furthermore, not only does the insurance code prohibit rate making by agreement and combination between companies, but our anti-trust statutes specifically include within their prohibitions agreements or combinations to fix ''the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm;'' and makes this both punishable as a felony as to individuals and a ground for forfeiture of charter as to corporations. [Chap. 47, Art. 1, secs. 8700-8716, R. S. 1929, 9 Mo. Stat. Ann. 6486-6498.] Here we not only have the claim that there was such an unlawful agreement and combination between respondents as to rates and rate increases, but it is also alleged that respondents entered into a conspiracy to obtain approval of such an increase, and settlement of this State's rights and interests in the pending controversy over rates, by bribery of its representative and public official, the Superintendent of Insurance.

■ There could hardly be a more serious charge of violation of the laws of this State, made against these foreign companies, which it permitted to enter its territory for purposes of lawful business relations with its citizens. They could hardly commit an offense, which would be more harmful to the rights of all citizens and the public welfare, than to attain their purposes (whatever they be) by bribery of the very officer entrusted by the Legislature to safeguard the interests of the State and its people with respect to insurance rates and practices. Whatever the Federal courts may decide about reasonableness of rates and ownership of impounded funds, they cannot determine the right of foreign companies to be licensed to do business in this State. That is a matter for our Legislature; and for our courts when this question turns on violation of our State laws. The Delmar Jockey Club and Standard Oil cases are ample authority for applying the remedy of and relief authorized under *quo warranto* to this situation. [See also Annotation 53 A. L. R. 1038; 22 R. C. L. 687; sec. 22; People v. New York City Ry. Co., 107 N. Y. Supp. 247; State ex rel. Barrett v. Boeckeler Lumber Co., 301 Mo. 445, 256 S. W. 175; State ex rel. Barker v. Assurance Co., 251 Mo. 278, 158 S. W. 640; State ex rel. Crow v. Firemen's Fund Ins. Co., 152 Mo. 1, 52 S. W. 595.] ■ We, therefore, hold that the facts stated in the information are sufficient to show this court has jurisdiction to proceed against respondents (except certain ones hereinafter designated) under *quo warranto*.

■ As to respondents' further contention, that this alleged violation of the criminal laws was one claimed to have been committed almost five years before the commencement of this proceeding, we think the Wymore case, supra, is a sufficient answer. As to their contention that it is improper to use *"quo warranto* as a punishment for alleged crime,'' this is fully answered by the following language of the United States Supreme Court in the Standard Oil case, supra:

"If, however, the act of misuser is not only *ultra vires* but criminal, there is no merger of the civil liability in the criminal offense. Separate proceedings may be instituted—one to secure the civil judgment, and the other to enforce the criminal law. Both cases may involve a consideration of the same facts; and evidence warranting a judgment of ouster may be sufficient to sustain a conviction for crime. A judgment may in one case sometimes be a bar to the other; but neither remedy is exclusive. The double liability, in civil and criminal proceedings, finds its counterpart in many instances; as, for example, where an attorney is disbarred or ousted of his right to practice in the court because of conduct for which he may likewise be prosecuted and fined.''

■ Likewise, respondents' argument, that the Superintendent of Insurance "has exclusive control of all matters of rates charged and collected by each of respondents on and after November 11, 1935,

and an action in *quo warranto* will not lie to interfere with the exercise of that jurisdiction," completely misconceives the nature of this proceeding. It has nothing to do with what rates should be, but only with what should be done about the conduct by which it is claimed respondents obtained their approval.

The following findings and conclusion were made as to certain respondents in our Special Commissioner's report:

"The following companies named as respondents herein had all withdrawn from the State of Missouri or had been taken over by other companies, or their licenses had expired, and were not licensed as insurance companies in Missouri on the date of the filing of the *Quo Warranto* proceedings (May 29, 1939) and hence no jurisdiction of the Supreme Court could extend to them in the *Quo Warranto* proceedings:

"Victory Insurance Company of Philadelphia, Philadelphia, Pennsylvania; United States Merchants & Shippers Insurance Company, New York, N. Y.; Svea Fire and Life Insurance Company, Ltd., Gotheburg, Sweden; The Stuyvesant Insurance Company, New York, N. Y.; State Assurance Company, Ltd., Liverpool, England; Presidential Fire & Marine Insurance Company, Chicago, Ill.; The Importers & Exporters Insurance Company of New York, New York, N. Y.; Hudson Insurance Company, New York, N. Y.; Guaranty Fire Insurance Company of Providence, Providence, R. I.; Detroit Fire & Marine Insurance Company, Detroit, Mich.; Chicago Fire & Marine Insurance Company, Chicago, Ill.; Tokio Marine & Fire Insurance Company, Ltd., Tokio, Japan; Superior Fire Insurance Company, Pittsburgh, Pa.; Minneapolis Fire & Marine Insurance Co., Minneapolis, Minn.; New Jersey Insurance Company; and Mechanics Insurance Company of Philadelphia, Pa. . . .

"The following companies named as respondents herein were and are not corporations, are not insurance companies, but group agencies; have never done business in Missouri as insurance companies, had·no cases pending in the Federal Court referred to in relator's information, proper service has not been had upon them, and jurisdiction herein would not..extend to them. They should be considered eliminated in reference to 'respondents' hereinafter:

"The Underwriters Grain Association, the Pittsburgh Underwriters Department, the General Cover Department."

Since no exceptions have been filed by the Attorney General, these findings will be adopted· and affirmed, and the separate pleas to the jurisdiction of each of the above-named respondents should be and are sustained. The separate pleas to the jurisdiction of all other respondents, and their exceptions to the Special Commissioner's report, are overruled. All concur.