## SAMUEL S. SHULL, Appellant, v. JAMES W. BOYD.

### Division One, June 28, 1913.

1. **CONTEMPT: Jurisdiction.** This court did not in In re Shull, 221 Mo. 623, pass upon the question of the jurisdiction of the circuit court to adjudge a witness in contempt before the case was actually on trial on the merits, but left that question open. All that was decided in that case was that the warrant of commitment was fatally defective in the narration of facts, namely, the questions and answers upon which the judgment for contempt was pronounced.

2. **APPEAL: Reply Absent from Abstract: Affirmance.** Where the abstract of appellant, who is the plaintiff, shows a reply was filed, but it is not set out in the abstract or its allegations reproduced, the judgment rendered for defendant upon his demurrer to the evidence will not be sustained on the assumption that the reply contained averments and admissions warranting the demurrer. When a case is tried as if a reply is in, the Supreme Court will not take the averments of the answer on new matter as admitted.

3. **FALSE IMPRISONMENT: Contempt: Damages from Attorney: Preparing Sheriff's Return in Habeas Corpus.** Where plaintiff had been committed for contempt and after his discharge under the writ of *habeas corpus*, sued, for false imprisonment, the attorney who had examined him upon the return of the subpoena *duces tecum* and to whose questions he refused to reply, testimony that said attorney prepared or assisted in preparing the sheriff's return to the writ of *habeas corpus* was properly excluded, the return being entirely neutral and showing precisely those things the statute requires an officer to embody in his return, and there being no attempt to show that the attorney was actuated by malice. The sheriff had the right to take legal advice and presumably consulted said attorney for that purpose.

4. **PRACTICE: Production of Papers Prior to Announcement of Ready for Trial: Subpoena Duces Tecum: Contempt.** The circuit court has power to issue a subpoena *duces tecum* to compel, not only the appearance of a witness, but the production of papers, as an essential precedent step leading up to the trial and in preparation therefor; and before compelling plaintiff, who has brought a suit to cancel certain special tax bills, to answer ready for trial, the court can issue its sub-

Shull v. Boyd.

poena *duces tecum* to a witness to produce such tax bills in court, and on his appearance compel him to submit to an examination as to whether he has such tax bills in his possession and as to their whereabouts, and on his refusal to answer commit him for contempt. And the witness cannot confine the inquiry to questions and answers as to whether he had the tax bills in his possession at the very time the subpoena was served or subsequently; the court is entitled to know if they were so hid or disposed of that a trial at that time was impossible.

5. ———: ———: ———: Jurisdiction: Incidents of Power: Refusal of Witness to Testify: Contempt. Jurisdiction includes the power to pronounce judgment and to award remedies provided by law, not only finally upon the cause on its merits, but in proceedings and steps necessarily precedent and incident to the trial on its merits, in favor of or against persons (including witnesses) brought before the court in a manner sanctioned by law. Where the court has jurisdiction of the subject-matter and of the parties to the suit, it has jurisdiction to issue subpoenas *duces tecum* to compel witnesses to produce papers necessary to a proper disposition of the cause on its merits, and, on the witness's refusal to answer reasonable inquiries as to the whereabouts of the papers, to do everything necessary to make the main power effectual, namely, to subject the witness to the pains and penalties of the statute for obstruction and impeding the orderly course of judicial proceedings.

6. FALSE IMPRISONMENT: Contempt: Discharge on Habeas Corpus: Jurisdiction: Refusal to Comply With Subpoena Duces Tecum. The mere fact that the warrant of commitment, issued after a subpoena *duces tecum* had been issued for plaintiff requiring him to produce certain tax bills and after his refusal to answer proper inquiries concerning his knowledge of the whereabouts of said tax bills and he was committed for contempt, was irregular on its face, in not complying with the requirements of the statute, and in consequence he was discharged by *habeas corpus*, cannot be held, in a suit by him for damages for false imprisonment, to hark back and to destroy the jurisdiction of the court to require him to answer such inquiries and to commit him for contempt for refusing to answer, to the extent of making all persons participating in the hearing guilty of trespass.

7. ———: ———: ———: Suit Against Attorney: Malice: Probable Cause. An attorney, who, at the judge's request, prepared a form of commitment of a witness who refused to answer proper inquiries concerning the whereabouts of papers necessary for a proper disposition of the case and which he

by a subpoena *duces tecum* was ordered to produce, and who prepared the return of the sheriff to the writ of *habeas corpus* sued out by said witness and endeavored by argument to induce the court issuing said writ to deny it, notwithstanding which it was issued and the witness was discharged because of defects on the face of the warrant, is not liable for damages in an action for false imprisonment in a suit brought by such witness, there being no evidence of malice on the part of the attorney, and probable cause being apparent. Something is due to the office and function of an attorney moving in the usual professional orbit, so long as those functions are performed in good faith and have the honest purpose of protecting the interests of his client.

Appeal from Buchanan Circuit Court.—*Hon. Lucien J. Eastin*, Judge.

AFFIRMED.

*L. C. Gabbert* and *Warren Rogers* for appellant.

(1) That Mosman had no jurisdiction as a judge of a court to enter the pretended judgment and issue the pretended commitment, is shown by the evidence to the effect that there was no case on trial when he pretended to enter of record an order upon which the commitment for alleged contempt was issued by him. No case being on trial, he had no legal right to proceed at all against appellant for refusing to answer questions. He could not commit for contempt for failure to answer questions. The pretended judgment and commitment were void. In re Shull, 221 Mo. 623. See cases under point 3. (2) Even though Judge Mosman did have jurisdiction to adjudge a contempt, still the respondent would be liable in this case for false imprisonment, because in this case, there was no adjudication of a contempt of court, and defendant drew up a pretended judgment and pretended commitment directing the sheriff to imprison appellant five days. The judgment was void in not adjudging a contempt,

the commitment was void in not setting forth an adjudication of a contempt, said Boyd handed same to said Mosman and induced him to sign same and place same in hands of sheriff, and from these facts the jury should have been allowed to decide whether said Boyd was not guilty as charged in the petition. He could not be protected from liability where the pretended judgment and pretended commitment which he wrote were wholly void, where they accomplished his purpose of imprisoning appellant. Such void commitment (void on its face) could not protect even the sheriff or the judge himself. Patzack v. Von Gerichten, 10 Mo. App. 424; Ray v. Dodd, 132 Mo. App. 444; Monson v. Rouse, 86 Mo. App. 97; Boeger v. Langenberge, 97 Mo. 390. (3) A court may have jurisdiction of a case and yet be without power to try it or take action in it other than to continue, or dismiss it. Before the court may act in a case a party to the case must ask to have it taken up. At least one party to it must announce ready for trial before a witness can be placed on the stand. The court cannot even pass on a pleading filed unless a party to the suit take it up and present it to the court. Clouser v. Noland, 72 Mo. App. 217; Cerenell v. King, 118 Mo. App. 191; Cross v. Gould, 131 Mo. App. 585. (4) The court erred in refusing appellant's offer to prove that Boyd prepared the return of the sheriff to the writ of *habeas corpus* issued by the Supreme Court In re Shull, in which Shull was attempting to gain his liberty—that Boyd prepared it with the purpose of defeating him in gaining his liberty—that the return as prepared was actually used by the sheriff. This evidence would show that Boyd countenanced Shull's imprisonment and that the imprisonment was by his direction, advice and assistance, bringing this case directly under the language of Monson v. Rouse, 86 Mo. App. 97.

*Culver & Phillip, Kendall B. Randolph* and *Perry A. Brubaker* for respondent.

(1)   At the trial of this case, the plaintiff, now appellant, failed to produce any evidence to sustain any material allegation in his amended petition.   It was therefore the bounden duty of the circuit court to order the jury to find for respondent.   The evidence introduced by the appellant on the trial conclusively shows that the respondent never said one word, and never made one suggestion, and never indicated to the circuit court that appellant, for failing to answer the questions asked him by Judge Carolus, and the respondent, ought to be found guilty of contempt of the court.   The record shows that the circuit court—Judge Mosman presiding—held that the questions propounded by Judge Carolus and Mr. Boyd, when the appellant was on the witness stand, were legal and proper.   The appellant says he declined to abide by the decision of the circuit court.   The appellant was sworn as a witness before the said circuit court.   He alleges in his petition, and swears that he was under the process of the court by a *duces tecum* subpoena to bring the said tax certificates into court.   The parties were ready for trial, if the said papers could be found or produced.   It is the law, and has been the law for two hundred years, that when an attorney in a case is brought into court by *duces tecum* subpoena commanding him to bring papers, which are necessary to the final adjudication of the case, he must do so.   If he has any excuse for not doing so he must make his excuse to the *nisi prius* court, and that court has a right to scrutinize his alleged excuse, and ascertain whether it be real or otherwise.   Bull v. Loveland, 27 Mass. (10 Pick.) 9; 8 Am & Eng. Ency. Law p. 28; Denton v. Erwin, 5 La. Ann. 18; Pickett v. Wallace, 54 Cal. 147; Amey v. Long, 9 East. 473; Chaplain v. Briscoe, 5 Smedes & Marshall (Miss.), 208; Sears v.

Hathway, 12 Cal. 277, 14 Am. & Eng. Rep. 27; Burns v. Superior Court, 140 Cal. 1; In re Mitchell, 12 Abb. Prac. 249; Ex parte v. Gfeller, 178 Mo. 270; In re Charles Dunn, 9 Mo. App. 255. (2) It goes without saying that the circuit court had jurisdiction at the time the appellant was asked the questions, in its court, by its order and under its direction. That fact is corroborated by appellant's testimony, and statements made by him when he was before the court on May 7 and 8, 1909, as a witness. He was then attorney for said Bank of North St. Joseph. Finley v. Refrig. Co., 99 Mo. 562. (3) "Even if the circuit court had no right to inquire whether its process had been, or was complied with, still the stalwart, admitted, unapproachable, undeniable fact that Boyd never directly or indirectly stated or suggested to the circuit court that Shull should or ought to be found guilty of contempt, or fined or punished in any way, stands proved by Shull." This court and all other courts have decided that where a court finds a person guilty of contempt, that person could not sue the judge of the court or any other person connected with the trial of the law suit. McIntosh v. Bullard, 129 S. W. 87; Sweeney v. O'Dwyer, 197 N. Y. 499. (4) The appellant testified that he appeared in court on May 7 and 8, 1909, as an attorney for the Bank of North St. Joseph, one of the defendants, which Mrs. Keller was suing, to set aside certain void tax bills. He also alleges in his petition and swears that he appeared in said court under the process of the court, namely, a *duces tecum* subpoena. He alleges that questions were asked him by the court in open court, and he refused to answer. His complaint against the respondent is that the circuit court thought he ought to answer certain questions. This is the sum and substance of the allegations in the petition. No cause of action is therein stated, and if there was a cause of action it is absolutely disproved by the appellant in his evidence introduced on the trial of

this case. McIntosh v. Bullard, 129 S. W. 85; Finley v. Refrigerator Co., 99 Mo. 559. (5) When he was before the court as an attorney for the bank and under a notice to produce papers, and the subpoena *duces tecum*, and when the case was on trial before the court without a jury, and the court desired to inquire from him whether he had obeyed the process of the court, the court certainly had a right to inquire of him concerning the matter. McIntosh v. Bullard, 129 S. W. 87; State ex inf. v. Shepherd, 177 Mo. 205. (6) Even if Boyd had complained to the court and tried to get the court to use its process, and did so in good faith, he would not be liable. Brueckner v. Frederick, 109 Mo. App. 618; Boeger v. Langenberge, 97 Mo. 390; Monson v. Rouse, 86 Mo. App. 97; Warren v. Flood, 72 Mo. App. 205. (7) As all the parties to the suit and all the attorneys representing all the parties in the suit of Keller v. Roth and the Bank of North St. Joseph were present in court on May 7 and 8, 1909, and as the matter of the examination by Judge Carolus and Mr. Boyd, attorneys for Mrs. Keller, of Mr. Shull as a witness, then in court and sworn by the court to make answer concerning the possession of the said tax bills, which were in said suit sought to be set aside, the said circuit court was and is the only judicial tribunal clothed with power under the Constitution and the laws of Missouri to determine whether the questions asked Mr. Shull after he had been sworn as a witness, were proper, relevant and material. Ex parte Gfeller, 178 Mo. 270; Ex parte McKee, 18 Mo. 599.

LAMM, J.—Plaintiff, an attorney at law, sued Laura E. Keller and James W. Boyd, her attorney, for false imprisonment, with the averment that the acts complained of were without excuse or provocation and maliciously done, laying his damages at $10,000 actual and $25,000 punitive.

At the close of his own evidence plaintiff dismissed Laura E. Keller, and, on behalf of defendant Boyd, the court gave an instruction directing the jury to return a verdict for him. Saving an exception, plaintiff took a nonsuit with leave. Failing to have the nonsuit set aside on timely motion, plaintiff again excepted and comes up by appeal.

Questions here seek a *resume* of pleadings and facts.

*The pleadings.*

Summarized, the petition avers that on a given date there was pending in Judge Mosman's division of the Buchanan Circuit Court a suit entitled Keller v. Roth et al. (it turns out that a certain named bank was co-defendant with Roth; for convenience we will call that defendant "the bank"). That Mr. Boyd represented Mrs. Keller in that suit; that when the case was called for trial, plaintiff refused to announce ready and the case did not go to trial; that at that time defendants herein, who were attorney and client in the Keller-Roth suit, "persuaded and induced" Judge Mosman to permit them to ask this plaintiff questions concerning certain tax bills; that plaintiff had been subpoenaed in the Keller-Roth suit to appear as a witness and have with him certain described tax bills; that he appeared in obedience to said subpoena *duces tecum*. That the questions said judge permitted the present defendants to ask concerned the possession and disposition of said tax bills prior to the service and issue of such subpoena; that plaintiff refused to answer them; that the Keller-Roth case was not on trial, such questions were not legally before Judge Mosman as a judge or court; that having refused to order plaintiff to answer the questions the present defendants continued asking them and "persuaded and induced" Judge Mosman to order plaintiff to answer them, which plaintiff refused to do; thereupon the present defendants persuaded and induced Judge Mos-

man to enter a judgment purporting to adjudge plaintiff guilty of contempt for such refusal and to have him committed to the county jail, which was done, and he was confined there for four hours "with felons and criminals." That the judgment and commitment were void in failing to adjudge plaintiff guilty of an offense. The petition then goes on to charge that the present defendants wrote the judgment and commitment and induced Judge Mosman to enter the same and to issue the commitment; that plaintiff was discharged from said commitment by a writ of *habeas corpus* issued by this court; that the present defendants prepared the return of the sheriff to said writ and participated in an attempt to get the Supreme Court to refuse to release him in the *habeas corpus* proceedings. That the action of Judge Mosman in ordering plaintiff to answer questions and adjudging him guilty of contempt and committing him to jail was without authority of law and was known to be by them. That the imprisonment of plaintiff was given wide publication, caused him humiliation and his reputation to suffer, put him to great expense and bodily discomfort, etc., to his damage, etc.

The joint answer of Mrs. Keller and Mr. Boyd admits the Keller-Roth suit was pending, that defendant Boyd was attorney for Mrs. Keller and that the subpoena *duces tecum* was issued for Mr. Shull requiring him to bring designated tax bills into court for use in the trial of that suit. It is next averred that the object and nature of the Keller-Roth suit was to cancel said tax bills and their lien upon certain real estate; that the bills were necessary to the trial; that the circuit court had full jurisdiction of the suit, parties and witnesses; that plaintiff refused to bring in the tax bills then in his possession; thereupon he was sworn to testify in regard to the matter and proper questions were asked him by said judge respecting his said failure and his custody and control of the bills, which in

a disrespectful and contemptuous manner plaintiff refused to answer. That he was thereupon adjudged guilty of contempt of court and committed to jail for five days, unless he should in the meantime answer said questions. Whether plaintiff was actually confined in jail, defendants say they have no knowledge or information sufficient to form a belief. Defendants deny they exercised any influence in procuring the judgment or its execution.

A reply was filed, but what it admitted or denied, or its scope or character in any respect, is not at all disclosed.

*The facts.*

The abstract is made from stenographic reports of the testimony of two hearings, wide apart, one the contempt case, the other the instant case for false imprisonment. They do not always clearly indicate at which hearing this or that testimony was elicited, so they have discursive running comments, *arguendo,* by Mr. Shull when on the stand in the contempt proceeding, either poorly reported or loosely delivered, resulting in a record made up in part of what Lord Chief Justice HOLT once called "skimble-scamble stuff." It is not a light task to separate the wheat from the chaff, i. e., fact from comment. Doing the best we can, a summary of the facts follows (we use respondent's abstract, for that is perfect; appellant's is not):

Two attorneys, Carolus and Bothwell, represented plaintiff in the Keller-Roth suit at the outset, Mr. Boyd coming into the case finally to assist. There is some mystery about the attorneys representing defendants. Of record, Warren Rogers, Esq., who officed with Mr. Shull, represented them. But Mr. Shull testified he also had authority to appear or not as he chose. His name was not signed to the pleadings and it would seem at the outset he desired to keep in the background any professional relation to the suit, if he had any. At a time dark, Mr. Shull was employed by a

Mr. Crowley of Andrew county, who (it now appears) at that time owned the tax bills, but he was not a party defendant. The fact of Mr. Shull's employment by Crowley or Crowley's connection with the subject-matter in litigation in the Keller-Roth suit, to-wit, the tax bills, was not disclosed to the court in the contempt proceedings but, as said, appears now and is testified to by Mr. Shull in the instant case. As we gather, the Keller-Roth suit was in equity to relieve Mrs. Keller's lots of the lien of certain special tax bills for street improvements and to cancel those bills. The case was regularly reached on the docket for trial on a certain day. On that day when it had been called no final announcement had been made, there being a question whether plaintiff Keller was ready until the tax bills were in court. In this condition of things, a Mr. Smith (an officer of the bank) appeared in obedience to notice and notified the court the bank had not possession of the bills, but that Mr. Shull had them. The character of the defense the bank was making can only be inferred by implication from what transpired and side remarks. We assume therefrom the bank disclaimed any title to the bills or any interest in the litigation and it seems to be conceded the bank's co-defendant, Roth, had parted with her title also. We gather that the bank had been collecting them, and was sued on the theory it held or claimed an interest in them. At any rate, preparatory to a final announcement on a call of the case for trial, the bills were wanted as a condition precedent to an announcement of "ready," and it was ascertained in that emergency that Mr. Shull had them in his possession. Appellant did not introduce the petition in the Keller-Roth case, but, absent that, enough appears to show to us that the cause may proceed here on the theory those bills were necessary to that trial. Mr. Shull was not then in court and, as said, did not appear as an attorney of record; thereupon in response to a telephone message purporting to come

from Judge Mosman to the effect that his presence was wanted, he came to the court room and there was served with a notice to produce the tax bills for use at the trial. The record tends to show at one place inferentially, we think, that he had them then in his possession in the court house, but Mr. Shull testified they were left by him in his office and that may be accepted as a fact. At all events he refused to produce them for use at the trial on a *notice,* suggesting that the way to get them was by a subpoena *duces tecum.* At that stage all parties seemed to impliedly admit the bills were material evidence, but as Mr. Shull was not a party to the suit and as the notice was not based on an affidavit and an order of the court, he stood on that technical ground in refusing to produce them, but announced that he would respond to a subpoena *duces tecum.* We can make nothing out of the record on the point except that Mr. Shull invited the issue of this subpoena. Thereupon the court ruled with him and directed the attorneys for Mrs. Keller to issue such subpoena. This was about twelve o'clock. Such subpoena was issued *instanter,* but before issued, at least before it was served, Mr. Shull went to his office knowing the subpoena would dog his heels. It will be of interest to ascertain from Mr. Shull's own lips, not only his intentions, but his attitude, towards these bills, the trial and the court. Here it is: ''I had told the court when Mr. Boyd was insisting on examining me before Judge Mosman, I had told Judge Mosman that that was a proceeding that did not justify them in asking me any questions about these matters, that is, that written notice, and perhaps I indicated that the only remedy would be for them, if they desired to have me testify, would be to issue a subpoena *duces tecum,* and I knew if they did it I was going to do just what I did do, and before they issued it, and in anticipation of the probability that they would issue a subpoena *duces tecum,* went right down to my office and put them in

the mail addressed to Mr. Crowley, so they were not in my possession any longer.''

Mr. Shull had the bills for two or three weeks until he parted with them in the few minutes of time elapsing between the time he knew they were needed (and knew Mrs. Keller was taking legal steps to get them), and the time the subpoena was served. The following questions and answers will further elucidate Mr. Shull's position and motives:

''Q. You kept possession of the tax bills until shortly after noon of the day of the hearing? A. Just as quick as we walked down from the court room, they were deposited in the mail; that was before any subpoena was served, Judge Culver.

''Q. You knew these tax bills were involved in that suit? A. Yes, sir.

''Q. You understood that was a suit to cancel the tax bills if they were held void? A. Yes.

''Q. You knew that in order to try that cause those tax bills should be in the court room, did you not? A. Well, that depends. . . .

''Q. Didn't you think it was proper, at least, it (the tax bill) should be there? A. I didn't consider one way or the other.

''Q. Now, will you tell how you expected the plaintiff in that suit to prove that there were tax bills? A. He was running his side; I was not supplying anything on behalf of the plaintiff; I was not running his side.

''Q. I am trying to find out what was in your mind. A. I don't know that I had anything in my mind on that subject.

''Q. You refused that day to tell where these tax bills were? A. Yes, sir.

''Q. And you knew that they were involved in that litigation? A. Yes, sir.

''Q. And you knew it was proper, at least, as you say, to have those tax bills in the court room when

that case was tried? . A.  I said I didn't think it was.
improper.

"Q.  Did you know it would be proper?  A.  It.
would do no harm, but it wouldn't be essential.  . . .

"Q.  You understand now, don't you, that it is.
preferable to have the original paper involved in a,
suit in the court room?  A.  Sure, it is preferable.

"Q.  And you understand that it is the duty of
the attorney to try to produce it in the court room?.
A.  Just as he pleases.

"Q.  Don't you understand that he must?  A.  I.
like to pursue the preferable course and it was prefer-
able to me not to bring them.  . . .

"Q.  Did you have any information or knowledge-
whatever on the subject as to whether or not these tax
bills were owned by Mrs. Roth, or Eva Roth, to whom
they were issued, or had been assigned to some one
else?  A.  Verbally, or in writing?

"Q.  Any way?  A.  Verbally I knew they belonged
to Mr. Crowley, but whether there was anything on.
the back indicating that I don't know.

"Q.  You received them from the president of the
Bank of North St. Joseph?  A.  Yes, sir.

"Q.  That is the same bank that was named as a,
party defendant in that suit before Judge Mosman?
A.  Yes, sir."

A few minutes after Mr. Shull had thus designedly
put it out of his power (as he thought) to respond to,
that part of the coming subpoena requiring the pro-
duction of these challenged tax bills, the subpoena
*duces tecum* was served upon him calling for their
production.  It is apparent that matters had moved
off at a smartish pace.  For Mr. Shull estimates in one
answer the time of the service as "two minutes" af-
ter mailing the bills in a mail box in his office building.
After lunch Mr. Shull appeared at the court house in
response to the subpoena.  In the forenoon prior to its.

issue he had been sworn, without any objection on his part that we can see, but had objected to testifying about the bills until plaintiff announced ready and the court, as said, had agreed with him that a subpoena *duces tecum* was necessary. In the afternoon he objected to testifying in relation to his production of the bills, claiming the case was not on trial on its merits. A proposition was made for him to make a statement, but he replied to the court in this fashion: "Well, if they don't want to ask me any questions, I am through." Thereupon, on such suggestion from him, the court directed that questions be asked him and he took the witness stand. Mr. Carolus commenced the examination and in response to his question, without objection, he answered that he did not have possession of the tax bills. In response to another, he stated that he had had them. "I have had them, but I haven't got them now; I have not had them since I have been subpoenaed to come to this court room." He was then asked by Mr. Carolus when he last had them and by Mr. Boyd how many seconds before he was subpoenaed did he have them. His reply to the court was, "I maintain that is none of their business." At that point the court said he could say when he parted company with possession of the papers. "You can say that much." His answer was, in effect, that he had not parted with possession since the service of the subpoena and they had not been under his control at any time since. Being asked by Mr. Boyd how shortly before that, he replied he did not think it was any of his business. The court then inquired if they were under his control at the time of the "notice" (meaning thereby the forenoon notice to produce); he replied that "the question was not quite fair to him," and then went on to argue that he was not responsible to the court or any one else in the case until the subpoena was issued and served. That at that time he did not have them and that such fact acquitted him. At this point there was

further argument in which Mr. Carolus, Mr. Boyd, the
court, the witness and Mr. Rogers took part. It will
serve no useful purpose to set forth the details. Ap-
pellant's counsel call it a "mix up," a "mock trial,"
and speak of "one Chesley Mosman," in that connec-
tion, meaning thereby the honorable and learned judge
of the court. The upshot of it all was that the court
permitted the examination in order to see whether the
witness was proposing "to avoid the process of the
court." Questions were then directed to him of the
same character he had already refused to answer, to-
wit, when he parted with possession of the papers.
To them the witness would only reply that they were
not under his control at the time he was subpoenaed
and they were not in the hands of any person who had
become his agent. He refused to answer when he had
parted with possession or what he had done with the
papers. The court told him that he did not wish to
assess a punishment but would have to hold him in con-
tempt. Witness said he would take his chances on
that, "I can swear out a *habeas corpus* on that I sup-
pose." At that point the court turned to Mr. Boyd
and asked him if he would draw up a commitment in
contempt. Mr. Boyd, saying nothing, commenced writ-
ing one, when Mr. Shull asked for time until the next
morning to look up the law. On that suggestion an
adjournment was had. The next morning on being
asked if he had satisfied himself on the law, a long
argument ensued on the part of Mr. Shull. The re-
sult was that, on being asked by the court whether he
would answer the questions, he refused again to do so
and the court inquired of Mr. Boyd if he had the com-
mitment. Mr. Boyd replied, "We have two forms of
orders." It seems the court took these forms and
adopted one after making some alterations. He sub-
sequently, as we read the record, in the absence of Mr.
Boyd, handed the altered one to the clerk with instruc-
tions to write out a judgment in accordance with the

form then handed him and give a certified copy to the sheriff. Before his arrest Mr. Shull prepared his application to this court for a writ of *habeas corpus* and when he got it ready he telephoned to a deputy sheriff to come and arrest him. This the deputy did and straightway made him a "trusty" without taking him to jail. He had been arrested before that "over the telephone;" but doubted its technical efficacy. The deputy met him by his arrangement at a drug store, went through the form of another arrest and after talking to him let him go. Two or three days later Mr. Shull heard from Jefferson City that his writ had been issued and that our marshal would be in St. Joseph at eight-thirty that evening. The record creates the impression that, expecting the marshal, he was taken into actual custody at about the time the marshal was due to arrive and taken to the jail where he remained for several hours because of the adventitious circumstances that the marshal came in on a belated train and they had miscalculated the time. There was testimony that publicity was given to the affair through the newspapers but, in this connection, it also appears that Mr. Shull requested newspapers to make publication. The record shows the public knew of it and that Mr. Shull was annoyed and humiliated. He also testified that he considered the manner of respondent Boyd in propounding questions to him at the contempt hearing "right savage."

There was an attempt to show on cross-examination that Mr. Shull courted his arrest, or expected to profit by it. We lay no deciding stress on it, but let it speak for itself, thus:

"Q. Mr. Shull, did you state to Mr. Hardcastle at the time he arrested you that that would make you circuit judge, the fact that you were arrested? A. No, for I never had any intention of being a candidate.

"Q. Did you state that to him in substance? A. If I did it would have been a pure joke; I have no

recollection of anything of the kind but I might have said it as a pure joke.

"Q. Did you make that statement to the sheriff or any of his deputies? A. I say no, no recollection of it.

"Q. Never made that statement? A. If you would call my attention to something—I might have said it, it might have been a joke, if it was said it was a pure joke; anybody jokes about things—better do that than cry, but I want to tell you I was not in any frame of mind for joking and don't think I did."

The clerk of the court testified that when Mr. Boyd presented the form to the court, it was examined, interlined and corrected by Judge Mosman, that is, it was then dictated to the clerk by the judge and rewritten. As said, as we read the record Mr. Boyd was not there at the time and had nothing to do with the contempt judgment or subsequent arrest except to hand up the form he had prepared at the court's request, and to ask the questions outlined and to argue for their competency.

As in his petition Mr. Shull lays some stress on the fact he is an attorney, and as he appeared at this or that time not only as a witness, but as an attorney for himself in the contempt proceedings, it may be well to go back a little and bring forward the record showing that he was proceeded against as a witness and not as an attorney in the contempt proceeding. At one place he says: "I can keep them" (the tax bills) "in my pocket until that time, until we are in the trial and he needs them as evidence. I don't want to be jumped onto the witness stand in the matter."

At another place this:

"Well, I was subpoenaed and accepted service of the subpoena; now if you announce ready for trial—whenever you announce ready for trial, I will be ready for business. That is all this subpoena requires me to be here for. . . .

"The Court: Well, I have not indicated—that you can announce before knowing about the papers.

"Mr. Shull: Upon the trial of the cause to have me produce certain papers—now then, your honor, if they have a cause the first thing for them to do is to go forward with their case. If they have a case that is hanging here in court which they desire to try, they know that their witness is standing in the court room.

"Mr. Boyd (interrupting): Mr. Shull is nothing but a witness.

"The Court: Do you want him as a witness?

"Mr. Boyd: Yes, sir.

"The Court: Be sworn."

At another place this appears:

"I am not here except under the process issued by this court. When I am called as a witness I will be here.

"The Court: They have a right, Mr. Shull, to know whether all papers are present before they make their announcement. They have the right to ask the question as to whether you have the paper; that I think—

"Mr. Shull: I don't believe I ever saw a case where they have the right to demand—

"The Court: This is the time right now when they are ready to announce and it depends, as I understand it, upon the possession of the papers being with you—whether they can announce or not; under those circumstances they have, I think, the right to require an answer of you; whether you will produce the papers; I think that is their privilege."

There were objections sustained to the introduction of testimony, but none of those rulings are now assigned for error except the exclusion of appellant's testimony tending to show that Mr. Boyd prepared the sheriff's return to the writ of *habeas corpus* issued by this court.

This court discharged Mr. Shull on the writ. [221 Mo. 623.]

Such is the case on the facts.

On such record we are of opinion the judgment must be affirmed.  Because:

(a)  As we gather it, In re Shull, 221 Mo. 623, is somewhat relied on by appellant as filling the office of an adjudication on the merits of the contempt case. We dispose of that contention *in limine*.

Two questions were put to us in that case, to-wit:

*First*:  Had Judge Mosman's court jurisdiction to adjudge a contempt against Mr. Shull before the Keller-Roth case was actually on trial on the merits?

*Second*:  Was the warrant of commitment under which Mr. Shull was incarcerated irregular in form or substance?

We ruled in favor of petitioner on the last question, holding the commitment fatally defective in narration of facts, to-wit, the questions and answers upon which the judgment of the lower court for contempt was pronounced. This conclusion we put on a statute (Sec. 3884; R. S. 1909) reading: "Whenever any person shall be committed for any contempt specified in this chapter, the particular circumstances of his offense shall be set forth in the order or warrant of commitment."  We held the warrant of commitment in judgment dealt in mere conclusions relating to the offense and did not set forth its "particular circumstances."  We refused to pass upon the first question, but left it open, and open it is to this day.  Hence, In re Shull, supra, is not *res adjudicata* on the question of jurisdiction.

**Contempt: Commitment Defective on Face.**

(b)  Respondent suggests the demurrer to the evidence can stand on the narrow technicality that the abstract of record is silent on the contents

**Appeal:
Reply as
Admission.** of appellant's reply to the answer. This contention hinges on the fact that the record shows a reply was filed, but passes by its allegations *sub silentio*. Respondent argues that, for aught appearing here, the reply may have made admissions fatal to appellant's case as a matter of law, and, since error in a court of general jurisdiction will not be presumed, it is open to legitimate inference that the reply was in terms warranting the demurrer to the evidence. But we decline to follow that lead. We have ruled that when a case is tried (as here) as if a reply is in, we would not take the averments of the answer on new matter as admitted. [Roden v. Helm, 192 Mo. 1. c. 83 et seq.] If respondent's contention be sound he was entitled to a judgment on the pleadings at the outset. As he did not ask that, but took the hazard of a trial on the merits, it must be presumed he was not entitled to such judgment. If not at the outset, no more was he at the sequel. He must stand or fall on the ruling made and that was on the *evidence,* not on the allegations of the reply.

The point is disallowed to respondent.

(c)  It is assigned for error that evidence was excluded tending to show that Mr. Boyd prepared or assisted in preparing the sheriff's return to our writ of *habeas corpus*. Appellant insists that the effect of that act was to show an illegal participation in the imprisonment of Mr. Shull by preventing his regaining his liberty. The point is barren of substance. There was no attempt to show either the terms of the return or that Mr. Boyd was actuated by malice or advised the sheriff contrary to what he knew the facts were. Speaking of the return, it is part of the records of this court and we have examined it. It is entirely neutral, shows precisely those things the statute requires an officer, holding a prisoner, to show when a writ of *habeas*

**False
Imprisonment:
Habeas Corpus:
Preparing
Return.**

*corpus* issues, to-wit, the authority and true cause of the imprisonment or restraint "setting forth the same at large," together with a copy of the warrant of commitment, etc.   [R. S. 1909, sec. 2456.]   Presumably the sheriff consulted Mr. Boyd as an attorney.   He had the right to do so and to use his services in that capacity.   He would be in hard lines indeed were it the law that he could not take legal advice.   So, Mr. Boyd had the correlative right to be consulted and render service to the officer in making a return commanded both by our writ and the law.

The point is disallowed to appellant.

(d)   Appellant's main contention is that the court was without jurisdiction of him as a witness, prior to an announcement of "ready," to investigate the presence of the tax bills in court under the subpoena *duces tecum,* hence the judgment against him was *coram non judice.*   It is agreed on all hands that if the court had jurisdiction then Mr. Boyd could not be guilty of aiding, abetting or participating in an attempt outside of the law to imprison Mr. Shull.   The question has several angles, thus:

(1)   That the court had power to issue a subpoena *duces tecum* to compel not only the appearance of a witness but the production of papers as an essential precedent step leading up to the trial and in preparation therefor, goes as of course.   It is an ancient prerogative of courts, timehonored and by no means mildewed.

Subpoena Duces Tecum: Preparatory to Trial: Contempt: Punishment.

That the court, before compelling parties to announce for trial, may ascertain whether its process has been obeyed is not only common sense, but is a usage as old as the existence of courts and is one needing no defense.   To this end witnesses are called prior to announcement for trial.   To call for the presence of documents ordered produced by a subpoena *duces tecum* in nowise differs in essence and quality from a call of

witnesses themselves. Says Lord ELLENBOROUGH, Chief Justice of the King's Bench, over a hundred years ago, in Amey v. Long, 9 East, l. c. 484:

"The right to resort to means competent to compel the production of written, as well as oral, testimony, seems essential to the very existence and constitution of a court of common law, which receives and acts upon both descriptions of evidence, and could not possibly proceed with due effect without them. And it is not possible to conceive that such courts should have immemorially continued to act upon both, without great and notorious impediments having occurred, if they had been furnished with no better means of obtaining written evidence than what the immediate custody and possession of the party who was interested in the production of it, or the voluntary favor of those in whose custody the required instruments might happen to be, afforded."

In a lofty conception of the administration of justice is there room for the pestiferous notion that a trial is a trap to catch a party litigant? Must he announce ready before he knows the process of the court has been obeyed, which said process, in turn, is the only means the law provides for getting ready? Is he to announce ready only to find in the thrall and throes of the trial, when too late to help himself, that papers essential to the hearing were not produced under a timely subpoena? Would a party in such fix be entitled to a continuance when he had not used diligence by way of inquiry in preparation for trial, or must he be cast as of course because he cannot go on, absent the papers? We all know it is the immemorial right of courts to see that their process has been obeyed as a preliminary to the actual trial itself. To that situation the maxim applies: *Cursus curiae est lex curiae.*

Indeed appellant, as we read the record, was willing to be sworn and to be questioned whether he had the papers. His position is that the power of the court

did not extend beyond the simple questions and answers: "Have you the papers?" "I have not." "Did you have them when you were served?" "No." Those answers, he argued, were the excuses acquitting him and shutting the door to further inquiry. But we do not so understand the law. Under the unhappy and unusual circumstances of this case, neither the court nor the plaintiff in the Keller-Roth suit was required to rest satisfied with those answers. Nor did the answer sift the matter. Yea is yea, and nay is nay, to be sure, but the inquiry was still in this case: was "yea" true—was "nay" false? What had he done with them? When? It was not for the witness, but for the court, to judge of the validity of the excuse and before the court could judge he should hear and know. Beside that, and this is close home, *the court was entitled to know if the papers were so hid or disposed of that a trial was impossible at that time.*

Speaking of a subpoena *duces tecum,* SHARKEY, J., in Chaplain v. Briscoe, 13 Miss. 1. c. 208, says:

"By the writ of subpoena *duces tecum,* the witness is compelled to produce all documents in possession, unless he have a reasonable excuse to the contrary, of the validity of which excuse the court, and not the witness, is to judge. [3 Stark. on Ev. 1721.]"

It was ruled in Denton v. Erwin, 5 La. Ann. 18, that courts are bound to vindicate and maintain the sanctity of their judicial proceedings before they consider the merits of cases.

In Bull v. Loveland, the Supreme Court of Massachusetts, 27 Mass. 1. c. 14, speaking through Chief Justice SHAW, made this apposite pronouncement:

"There seems to be no difference in principle, between compelling a witness to produce a document in his possession, under a subpoena *duces tecum,* in a case where the party calling the witness has a right to the use of such document, and compelling him to give testimony, when the facts lie in his own knowl-

edge.. It has been decided, though it was formerly doubted, that a subpoena *duces tecum* is a writ of compulsory obligation, which the court has power to issue, and which the witness is bound to obey, and which will be enforced by proper process to compel the production of the paper, when the witness has no lawful or reasonable excuse for withholding it. [Amey v. Long, 9 East, 473; Corsen v. Dubois, 1 Holt's N. P. R. 239.] But of such lawful or reasonable excuse the court at *nisi prius,* and not the witness, is to judge. And when the witness has the paper ready to produce, in obedience to the summons, but claims to retain it on the ground of legal or equitable interests of his own, it is a question to the discretion of the court, under the circumstances of the case, whether the witness ought to produce, or is entitled to withhold the paper.''

(2)   Jurisdiction, I think, includes, *ex necessitate rei,* the power to pronounce judgment and to award remedies provided by law not only finally upon the cause on its merits, but in proceedings and steps necessarily precedent and incident to the trial on the merits, in favor of or against persons (for instance witnesses) brought before the court in a manner sanctioned by law. [R. S. 1909, secs. 6369, 6370.] Tersely, jurisdiction is the authority of a court to hear and decide.

**Jurisdiction: What it Includes.**

In this case the court had jurisdiction of the subject-matter of the Keller-Roth suit; it had jurisdiction of the parties to that suit; it had jurisdiction to issue the subpoena *duces tecum*; by the issue and service of that subpoena it acquired jurisdiction of Mr. Shull and his refusal to answer was an act *in facie curiae.* That by necessary implication it had jurisdiction to decide questions incident to the essential and usual steps in that suit preceding the trial, I think is without a shadow of doubt. The production of the papers was as essential as the production of the witness and for this court to say that the *nisi prius* court had no

right to inquire whether the papers were present or within reach or was compelled to take, without further examination, the answer of the witness that he did not have them as the be-all and end-all of the matter would be a lapse into judicial nonsense. The very object of any subpoena at all is to bring the witness "under the order and censure of the court."

Furthermore, under such erroneous view of the law an attorney, who had invited a subpoena *duces tecum* (as here) and who knew he would thereby be required to produce papers *instanter* (as here) could, by the swift artifice of getting a little ahead of the officer's service, toss them in a pigeonhole or coal scuttle or slip them to a friend and not only stand acquit under the formula "I have not got them," but thereby he could impede the trial on one hand and thwart justice to the scandal of its administration on the other.

The inquiry in this instance did not go beyond reasonable bounds. There was need of one. The court exercised uncommon patience at a waste of time. Appellant's acts were so inexcusable and regrettable that any commentary on those facts would weaken their effect.

Moreover, the maxim is: the incidents of the thing follow tacitly. [Beheret v. Myers, 240 Mo. l. c. 79.] Assuming that the court had the power to bring in the papers, as we do, then an incident of that power would be to see if they had come (or could be had), and sift and weigh any excuse offered. It has always been the rule that when a clear main power is granted by the law, everything necessary to make it effectual to attain its principal end is necessarily implied. A grant of power is to be construed so as to include the authority to do all usual things necessary to accomplish the object so granted. In re Sanford, 236 Mo. l. c. 692, may be consulted with profit on this head for our Brother Woodson has there marshaled the authorities on that rule of construction. The application

of the principle is constant and multiform. [Church v. Hadley, 240 Mo. 1. c. 695, and cases cited; Ex parte Marmaduke, 91 Mo. 1. c. 251; State ex rel. v. Perkins, 139 Mo. 1. c. 118; Bank v. Bank, 244 Mo. 1. c. 574.]

The premises considered, we rule that information sought for by the questions was proper and within the jurisdiction of the court, that the witness could be lawfully required to give it, failing in which and thereby obstructing and impeding the proceedings he was subject to the pains and penalties prescribed for refusing to answer. [R. S. 1909, sec. 6372; Burns v. Superior Court, 140 Cal. 1.]

The mere fact that the warrant of commitment was irregular on its face in not complying with the statute, cannot be held to hark back and destroy the jurisdiction of the court to an extent making all participating in the hearing guilty of a trespass.

(3) We pass by those features of the case that bring Mr. Shull dangerously near the doctrine of the maxim *volenti non fit injuria,* though something could be said on that score. As pointed out by a brother, there is a faint tang or suggestion of Dodson and Fogg tactics in the record, as readers can see who recall the animated scene in their chambers, Freeman's Court, Cornhill, in the year 1830, anent the celebrated Martha Bardell affair as reported by Dickens (Pick. Pap., Chap. 20) when (with an eye to damages) they invited both slander and assault from Samuel Pickwick. But putting that to one side and coming closer home, at least Mr. Shull was his own jailor, this by virtue of the law and the terms of the order of commitment. Speaking in figure, he had in his pocket the key to his own cell. He could release himself instantly by testifying.

False Imprisonment: Rights of Attorney in Contempt Proceedings.

We concede to appellant the general principle that all wrong-doers who aid, abet or participate in a trespass are liable, and pass by without discussing the

question whether on the facts Mr. Boyd was in any just sense an aider, abettor or participator in issuing the irregular commitment within the doctrine of such cases as Clark v. Thompson, 160 Mo. 461, and Brueckner v. Frederick, 109 Mo. App. 614. Something might be said on both sides of that proposition; for instance, was not the mere fact that the warrant was lacking in form and not regular to the ultimate gain of appellant? Suppose it had been *regular,* in what fix would Mr. Shull have been under the view we have taken? In that view of it the irregularity complained of is a two-edged sword cutting both ways; for if the commitment bound him with bonds, the *irregularity* was a blessing in disguise, for it is the very thing that finally cut them in twain. We concede to appellant the proposition that in an action for false imprisonment as a general rule want of probable cause and the presence of a malicious motive are not necessarily involved (Boeger v. Langenberge, 97 Mo. 390); and come to the proposition whether under the peculiar record facts of this case Mr. Boyd, in the exercise of his rights as an attorney at law representing his client Mrs. Keller, could be held liable in this action. That something is due to the office and function of an attorney moving in the usual professional orbit, so long as those functions are performed in good faith and have the honest purpose of protecting the interests of his client, is an accepted doctrine of the law, applicable here. [Campbell v. Brown, 2 Woods, 349.] In Peck v. Chouteau, 91 Mo. 138, there was a count for false imprisonment and the above doctrine was laid down with the approval of Justice Bradley's exposition of the law in that regard in the Campbell-Brown case, to-wit: "If attorneys cannot act and advise freely and without constant fear of being harassed by suits and actions at law, parties could not obtain their legal rights." [p. 152.] In the Peck-Chouteau case the doctrine of Burnap v. Marsh, 13 Ill. l. c. 538, to the same effect, is

also approved. [*Q. v.*] The instant case is quite barren of any evidence of malice. That probable cause existed is also apparent.

But we have pursued the matter far and, the premises all in mind, nothing is left but to pronounce judgment which we now do, viz., the demurrer was well ruled and the judgment, *nisi*, should be affirmed. It is so ordered. All concur.